SUNSHINE BOOKS LTD.

v.

TEMPLE UNIVERSITY—OF the COMMONWEALTH SYSTEM OF HIGHER EDUCATION.

Civ. A. No. 80–4546.

United States District Court, E. D. Pennsylvania.

Sept. 30, 1981.

---

Scott D. Patterson, Philadelphia, Pa., for plaintiff.

Michael Lehr, Philadelphia, Pa., for defendant.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

Plaintiff, Sunshine Books, Ltd. ("Sunshine"), brings this action against defendant, Temple University ("University"), alleging violations of the Pennsylvania Unfair Sales Act, 73 P.S. § 213 and section 2 of the Sherman Act, 15 U.S.C. § 2.

The University operates five book stores, one of which is located on the main campus. In January of 1979, Sunshine began to sell various school supplies and some graduate and undergraduate textbooks at approximately ten percent off the suggested retail prices from a truck or trailer parked on a street near the University's main campus bookstore. Since then, Sunshine has continued to operate in such a manner for the first two or three weeks of each semester, thereafter closing shop until the start of the next semester.

The incident which gave rise to the present complaint occurred in September of 1980 when the University's main campus book store ran a one week "manager's special" offering fifty undergraduate textbooks at fifteen percent below the suggested retail prices. Sunshine posted the University's prices on its trailer and offered those same titles at yet lower prices.

Sunshine then brought this action alleging that the University had attempted to monopolize the sale of undergraduate textbooks to students at the University by means of predatory pricing, forcing Sunshine to sell books below cost in order to compete with the University's prices. The basis of Sunshine's claims is that the University priced books sold during the manager's special below cost.

The University filed a motion to dismiss or in the alternative for summary judgment alleging that it did not sell the textbooks below cost and that it therefore did not violate section 2 of the Sherman Act or the Pennsylvania Unfair Sales Act. Though the University alleged that the complaint was deficient in several respects, it chose to base its motion solely on the issue of whether Sunshine could adequately demonstrate that the University priced books so low as to be considered predatory. By order dated February 10, 1981, I held the University's motion in abeyance pending completion of discovery on the cost issue. That discovery is now completed and the case is presently before the Court on the University's motion.

Congress intended the Sherman Act to promote vigorous competition. A basic tenet of competition is that sellers compete for a share of the market driving the prices of goods lower. The more efficient firms survive because they are cost efficient. The less efficient firms are driven from the

market because they cannot make a profit at the lower prices. Our antitrust laws are designed to enhance the competitive process and they therefore protect competition, not competitors.

■ A necessary element of a section 2 Sherman Act claim is proof of anticompetitive conduct. *Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir. 1977), *cert. denied.*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). Anticompetitive conduct may be used to infer a specific intent to monopolize, and, if coupled with proof of monopoly power, it may satisfy the requirement that the attempt have a dangerous probability of success. *Northeastern Telephone Co. v. American Telephone and Telegraph Co., et al.*, 651 F.2d 76 (2d Cir. 1981).

Sunshine alleges that the prices charged by the University during the one week manager's special were predatory. Although the concept of predatory pricing is difficult to define in precise economic terms, it has generally been defined as the sacrificing of present revenues for the purpose of driving competitors from the market with the intent of recouping lost revenues through monopoly profits thereafter. *See O'Hommel Co. v. Ferro Corp.*, 659 F.2d 340 (3d Cir. 1981). To determine whether a firm has engaged in predation, it is necessary to compare its prices with its costs.

Costs can be divided into two broad categories—fixed costs, which do not change with output, and variable costs, which do change with output. The sum of all costs divided by output equals average total cost. The sum of all output divided by variable costs equals average variable cost. Marginal cost is the incremental cost that results from producing additional output.

The question is: which measure of cost is best suited to determine whether a firm is engaging in predatory pricing. Several courts and commentators agree that only prices below marginal cost should be used

to infer predatory pricing.[1] *See e. g., Northeastern Telephone Co. v. American Telephone and Telegraph Co., et al.*, 651 F.2d 76 (2d Cir. 1981); *Hanson v. Shell Oil Co.*, 541 F.2d 1352 (9th Cir. 1976), *cert. denied* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *Weber v. Wynne*, 431 F.Supp. 1048 (D.N.J.1977); Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975).

The line between competitive and predatory pricing is difficult to draw. If the price below which predatory pricing will be inferred is too high, price competition will be discouraged, a result inconsistent with the antitrust laws. Since marginal cost is the cost of producing an additional unit, any price at or above marginal cost will not reduce short run net returns. Furthermore, when price is at marginal cost, the consumers are willing to pay the cost of producing the last unit of output; therefore the economy is achieving the most efficient allocation of resources in the short run. *See* Areeda & Turner, *supra*, at 709–711.

At prices above marginal cost, output is restricted, and the economy produces at less than optimal efficiency in the short run. *Id.* at 711. A price floor above marginal cost would also protect less efficient firms and allow them to survive despite cost inefficiency.

■ I am persuaded by the Areeda & Turner analysis and conclude that only prices below marginal cost can be presumed to be predatory. Because marginal cost cannot be accurately measured by conventional accounting methods, I will use average variable cost in its place. *Accord, Northeastern Telephone Co. v. American Telephone and Telegraph Co., et al.*, 651

---

[1]. The Third Circuit has recently expressed a preference for a rule providing that only prices below marginal cost would be used to infer predatory pricing, but it has not as yet decided this issue. *See O'Hommel Co. v. Ferro Corp.*, C.A. No. 96–1299 slip op. at 24–25 (3d Cir. filed Sept. 12, 1981).

F.2d 76, 88 (2d Cir. 1981); *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 432 (7th Cir. 1980); *Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848, 858 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Pacific Engineering & Production Co. v. Kerr-McGee Corp.*, 551 F.2d 790, 797 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977).

■ Variable costs change with output and "typically include such items as materials, fuel, labor directly used to produce a product, indirect labor such as foreman, clerks, and custodial help, utilities, repair and maintenance, and per unit royalties and license fees." Areeda & Turner, *supra*, at 700. Fixed costs "typically include most management expenses, interest on bonded debt, depreciation, property taxes and other irreducible overhead." *Id.* Whether a cost is considered fixed or variable depends on the time frame in question. As the time frame lengthens more fixed costs become variable. *Id.* The costs which are variable in the present case include: invoice costs, freight, bad check expense, payroll expense and advertising expenditures.

The total sales of the fifty titles included in the manager's special amounted to $118,427.85 and their invoice price was $108,012.40, leaving a gross margin of $10,415.45 or 8.8% of total sales.[2]

Both parties agree that the freight in charge for the books sold during the manager's special was $2,134.65. The University argues that the cost of shipping returned books should not be considered a variable cost of the books sold during the special because the special increased sales, thereby decreasing the books to be returned. The University, however, controls its freight expense through its ordering policies. Sunshine argues, and I agree for the purposes of this motion, that the University ordered more books than usual in anticipation of increased sales due to the manager's special. The freight expense of the 2166 returned books, therefore, may be considered part of the variable cost of the books sold during the manager's special. That expense, as calculated by Sunshine, was $528.41 each way, or $1,056.82.[3]

Both parties accept the bad check expense figure of $355.28 for the discounted books sold during the manager's special. The University also spent $148.00 having handbills specially printed to advertise the manager's special.

The University calculates its payroll expense to be $2,885.00. It arrived at this figure by listing the amount of direct labor devoted to all textbook sales during the period of July 1, 1980 to September 13, 1980 ($42,363.00) and then dividing that total by the textbooks ordered, shelved and priced during that period to arrive at a per volume figure of .311. Multiplying .311 by the number of discounted textbooks sold during the manager's special, the University determined its payroll expense to be $2,885.46.

Sunshine accepts the University's calculations as to the amount of labor directly related to the textbook sales with the exception that it would increase the amount of the manager's labor in the project, raising the allocation figure to $45,052.83. Using the University's method of calculation, this raises the cost per textbook to .331 and the amount directly attributable to the

2. The University has not calculated its revenues by multiplying units sold by the sale price. Instead, it has multiplied units no longer in inventory by the sale price.

3. The University main campus book store has on hand 16,486 books, which were discounted as part of the manager's special. During the special, 9,278 of the discounted books were sold and 2,166 were returned, leaving 5,402 books unaccounted for. Sunshine assumes the unaccounted for books were eventually sold. The freight cost of the returned books was an estimated $528.41 each way. Sunshine argues, and I agree for the purposes of this motion, that the freight cost of the returned books must be borne by the books sold. Although Sunshine argues that only 9,278/14,680 of the $1,056.82 freight on the returned books, or $667.91, should be attributed to the variable cost of the discounted books, I assume that the cost of return freight is entirely due to overordering in anticipation of the special, and therefore it is a variable cost attributable to the special.

9,278 textbooks sold during the manager's special to $3,071.02.

The University did not include in its calculations the cost of ordering, pricing and shelving books that were part of the special but were returned as unsold. Although these books may not have been priced and shelved—there is no evidence that they were unpacked—I will assume for the purposes of this motion that they were and that they should be considered part of the variable cost of the manager's special. This brings the payroll expense attributable to the manager's special to $3,787.97.[4]

The sales and costs figures relating to the manager's special are as follows:

| GROSS REVENUES | | $118,427.85 |
|---|---|---|
| VARIABLE COST | | |
| Invoice Cost | $108,012.40 | |
| Freight In | $ 2,134.65 | |
| Freight for Returned Books | $ 1,056.82 | |
| Bad Check Expense | $ 355.28 | |
| Handbill Expense | $ 148.00 | |
| Payroll Expense | $ 3,787.97 | |
| | $115,495.12 | |
| | | $115,495.12 |
| RETURN ABOVE VARIABLE COST | | $ 2,932.73 |

Sunshine contends that the cost of theft should be considered in the calculation of variable cost. Sunshine has not shown, however, that theft varies with output. The absence of a direct correlation between theft and sales is borne out by the fact that in 1974–75 the University main campus book store sold $1,506,852.00 worth of textbooks and the shrinkage of inventory because of theft was 5.7%, yet in 1978–79, when the book store sold $1,791,193.00 worth of textbooks, the shrinkage due to theft was only 2.9%.

Theft as a cost of doing business is distinguishable from freight cost on unsold books or bad check expense. It is at least arguable that freight cost on unsold books, as a constant ratio of orders to sales, will increase as sales increase. So, too, the greater the volume of business the more bad checks an establishment will receive. But since Sunshine has shown no evidence that more sales leads to more thefts, I cannot consider losses due to theft as a variable cost attributable to the manager's special.

On the basis of the evidence presented I find that the books discounted at the manager's special were priced above average variable cost—that the revenues exceeded variable costs by $2,932.73.

Sunshine asserts that there are other "hidden" costs which should be considered. Rule 56(e) of the Federal Rules of Civil Procedure provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this Rule, must set forth *specific facts* showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. (Emphasis supplied.)

Sunshine's mere allegations of additional costs do not meet the requirements of Rule 56(e). As required by law, I have drawn all inferences from the evidence in favor of Sunshine. I cannot, however, speculate about the further evidence which Sunshine alleges exists concerning variable costs. Conclusory statements unsupported by evidence simply cannot defeat a properly supported motion for summary judgment.

While I am cognizant of the general rule that summary judgment in antitrust cases should be granted sparingly, on this record I can only conclude that the university did not engage in anticompetitive conduct and therefore it is entitled to judgment on Count I.

Count II of the complaint is based on alleged violations of the Pennsylvania Unfair Sales Act 73 P.S. § 211 *et seq.* Because I have granted summary judgment on Count I of the complaint, and since there are no extraordinary circumstances presented here, I decline to exercise pendent jurisdiction over Count II. *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 196 (3d Cir.

---

4. Multiplying the number of returned books, 2,166, times the cost per book for ordering, pricing and shelving, .331, equals 716.95, added to the existing payroll calculation of $3,071.02 equals $3,787.97.

1976); *Gans v. Filmways, Inc.*, 453 F.Supp. 1116 (E.D.Pa.1978), *aff'd mem.*, 595 F.2d 1212 (3d Cir. 1979).