**DOUBLE H PLASTICS, INC.**

v.

**SONOCO PRODUCTS COMPANY.**

**Civ. A. No. 82–1904.**

United States District Court,
E.D. Pennsylvania.

Jan. 21, 1983.

Lloyd S. Clareman, Webster & Sheffield, New York City, Schnader, Harrison, Lewis & Lewis, Philadelphia, Pa., for plaintiff.

Franklin Poul, Wolf, Block, Schorr, Solis-Cohen, Philadelphia, Pa., Gerald A. Connell, Lee H. Simowitz, Baker & Hostetler, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

Plaintiff, Double H Products, Inc. ("Double H"), brings this action against defendant, Sonoco Products Company ("Sonoco"), alleging violations of Section 2 of the Sherman Act, 15 U.S.C. § 2;[1] Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) (1973) (hereinafter referred to as Section 2(a) of

---

1. Section 2 of the Sherman Act provides, in pertinent part, that: "Every person who shall ... attempt to monopolize ... any part of the trade or commerce among the several States ... shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding fifty thousand dollars ... in the discretion of the court."

the Robinson-Patman Act[2]); and Commonwealth of Pennsylvania common law, in particular, intentional interference with plaintiff's prospective business relations.

The plaintiff claims that Sonoco engaged in predatory pricing and other anticompetitive conduct to drive Double H out of business. It is also Double H's contention that Sonoco has sold certain products to National Cash Register ("NCR") below cost levels as part of a "strategy of monopolizing the business machine core market by discouraging paper core users from shifting to plastic before Sonoco has completed its conquest of Double H, its only serious competition in plastic." (Plaintiff's Post-Trial Memorandum, p. 25). Plaintiff seeks damages and injunctive relief. The case was tried to the court sitting without a jury.

## I. FACTUAL ANALYSIS

Business machine cores, the product on which Double H's claims are based,[3] are cylinders around which rolls of paper are wrapped. They are made of either plastic or fiber.[4] Business machine cores are sold to paper converters who wind paper around the cores to produce finished paper rolls for such business machines as cash registers and adding machines.

Sonoco manufactures both plastic and paper cores. It has long been in the business of manufacturing fiber cores, competing mainly with Crescent Paper Tube Co. ("Crescent") of Kentucky. Sonoco went into the production of plastic cores in January, 1980.

The plastic business machine core business is relatively new. Double H is a primary force in that business, a company founded in 1974 by Mr. Harry Harp who, along with his wife, owns all of the stock in Double H. Prior to plaintiff's entry into the manufacturing of plastic business machine cores, paper cores were the leading type of cores sold. However, the availability of plastic cores was attractive to some customers of paper cores. Customers preferred plastic cores because they were lighter in weight, dust free and sold at a favorable price.

Sonoco began to lose a large number of its paper core customers to Double H. To continue in the machine core business, Sonoco had two alternatives. It could either acquire Double H or it could enter the plastic core business itself. In 1978 Sonoco personnel contacted Mr. Harp for the purpose of acquiring Double H and negotiations went on throughout the year. In early 1979 Mr. Harp ultimately rejected Sonoco's offer.[5]

After Sonoco was unsuccessful in its effort to acquire Double H, it bought the equipment necessary for the production of plastic cores. In January, 1980, two months after the equipment was installed and delivered in Sonoco's Pickney plant in Union, South Carolina, Sonoco began processing and selling plastic cores. The company also adapted an extrusion machine that it already owned. It expended around

---

**2.** Section 2(a) of the Robinson-Patman Act provides, in relevant part that: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade or quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination...."

**3.** Plaintiff contends that business machine cores are the relevant product market. Sonoco claims that Double H has vacillated in its definition of the relevant product because at one point it included cores other than business machine cores. No prejudice appears to have been suffered by Sonoco. Sonoco has not even presented evidence that the inclusion of other cores would be proper. We therefore accept business machine cores as the relevant product.

**4.** Fiber cores are cardboard or paper cores.

**5.** Mr. Harp testified that he was displeased with the terms of the offer, including a covenant not to compete, as well as the salary structure for himself and his employees.

$210,000 in buying the equipment, modifying the machine it owned, and expanding the plant. Sonoco experienced production difficulties for the first six months of operations. Those problems were worked out.

When Sonoco began selling plastic business machine cores, it shared the market with Double H and two other companies, Vulcan Corporation ("Vulcan") of Cincinnati, Ohio and Southern Metals & Plastics ("Southern") of Memphis, Tennessee. Sonoco's initial list price was $7.80 per thousand for 2¼" cores.[6] At that time, Double H's list price for those cores was $7.50 per thousand. Southern's list price was $8.21 with frequent off-list sales at lower prices and Vulcan had a list price at $7.95 effective February 1, 1980.

In March, 1980, Sonoco introduced a 5% discount for truckload orders, bringing its price to $7.41 for such orders. In July, 1980, it announced a price increase, telling its sales agents that the cost of the necessary raw material, polystyrene, had increased from $.28/lb. in January, 1979[7] to a current price of $.50/lb. It sought a 10% price increase with the expectation that its chief competitor, Double H, would also increase its price. When informed by customers that its price was too high and that Double H did not raise its price, Sonoco chose not only to rescind its increase but to reduce the price. On September 2, 1980, Sonoco wrote to its customers announcing a new reduced price of $7.15 per thousand. It eliminated its truckload discount at that time.

On October 23, 1980, Double H began offering a 5% truckload price, after receiving feedback from its customers concerning Sonoco's prices, thereby reducing its price to $7.12 per thousand for a truckload. Approximately 25% of Double H's customers received the truckload price. At that time, Double H used independent salesmen who carried its product as well as other companies' products. They received a 5% commission until the truckload discount went into effect at which time their commission was cut to 2½%. Double H, which until this time had had to make little effort to obtain customers, began advertising, for the first time, in a trade magazine.

In February, 1981, Sonoco again considered a price increase. An approach to one of its customers concerning that possibility resulted in a warning by the customer that it would give all of its business to Double H if Double H promised it a six month price protection. Nevertheless, Sonoco announced a price increase in March, 1981, to become effective in May, with the explanation that the increase was necessitated by raw material increases. In monitoring customers' reactions to the increase, Sonoco determined that it was risking the loss of a number of customers if Double H held its price. After postponing the increase, Sonoco was advised by at least two customers that the proposed increase would have caused them to give their business to Double H. Sonoco then announced that it would not increase its prices "until further notice." (Defendant's Exhibit 275).

Although until now Double H appeared to be Sonoco's sole serious competitor, Southern began competing in its pricing and, at times, undersold both Sonoco and Double H throughout 1981 as well as 1982.

In July, 1982, Sonoco announced a price increase for the third time. The price was to go up by 9½% effective August 30, 1982. This time customers warned it that Southern and Vulcan were favorable alternatives to Sonoco in that it was their belief that neither company would raise its price for the balance of 1982. Some customers threatened to switch from plastic cores to paper cores if the increase went into effect. Instead of increasing its prices by 9½% on August 30th, Sonoco announced it would increase the price by 6%. Even this increase met with resistance from some customers. Sonoco was required to meet the

---

**6.** Both parties agree that prices on the 2¼" natural adding machine core, the most common size sold, fairly represents the general level for extruded plastic business machine cores.

**7.** This was the time when Sonoco went into the plastic machine core business.

lower prices of competitors by scaling back its 6% increase to a 1% increase for one of its customers in order to retain its business. In the course of monitoring the pricing of its competitors, Sonoco personnel learned that Double H had announced a 4% increase in its prices with elimination of its truckload discount. However, Double H rescinded the price increase upon learning of Sonoco's decision to scale back its own increase.

## II. LEGAL ANALYSIS: SHERMAN 2

■ The elements of attempting to monopolize under Section 2 of the Sherman Act have been established in the Third Circuit. The plaintiff has the burden of proving: (1) the relevant market; (2) that "the actor has the specific intent to monopolize the relevant market"; and (3) that "the actor has sufficient market power to come dangerously close to success." *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1348 (3d Cir.1975). Additionally, the plaintiff is required to show that the defendant engaged in "predatory or anticompetitive conduct directed to accomplishing the unlawful purpose." *Chillicothe Sand & Gravel v. Martin Marietta Corp.*, 615 F.2d 427, 430 (7th Cir.1980).[8] The plaintiff is also required to show that defendant's unlawful conduct proximately caused plaintiff's injury. Clayton Act § 4, 15 U.S.C. § 15 (1973).

In the present case, plaintiff relies on defendant's pricing practices to prove the requisite anticompetitive conduct and specific intent. Specifically, it argues that Sonoco engaged in predatory pricing. Double H also argues that Sonoco's announced price increases for plastic cores, followed by rescissions of the increases, were exe-

cuted with the hope and expectation Double H would follow suit. Sonoco's motive, plaintiff argues, was to "enforce price obedience by Double H as part of its efforts to control the business machine core market." (Post-Trial Memorandum of Plaintiff, p. 22).

■ Predatory pricing is below cost pricing wherein there is a "deliberate sacrifice of present revenues for the purpose of driving rivals out of the market and then recouping the losses through higher profits earned in the absence of competition." Areeda and Turner, *Predatory Pricing and Related Practices under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 698 (1975). To determine "cost" for purposes of finding below cost pricing, the generally accepted standard is "average variable cost,"[9] rather than "marginal cost."[10] *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 349 (3d Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982); *Sunshine Books Ltd. v. Temple University*, 524 F.Supp. 479, 481 (E.D.Pa.1981). Predatory pricing, then, is pricing below the average variable cost of manufacturing and selling a company's product. The inference that can be drawn from predatory pricing is that the defendant is acting with anticompetitive intent.

The Third Circuit has indicated that it favors the Areeda and Turner analysis as set forth in their 1975 law review article but, as yet, has not fully embraced it. *O. Hommel Co.*, 659 F.2d at 352.[11] Other circuits, however, have accepted the average variable cost standard. *See, William Inglis & Sons Baking Co. v. ITT Conti-*

---

**8.** A recent Third Circuit opinion notes that conduct has not been expressly adopted as an element of attempted monopolization but appears to have accepted it as implicitly required. *Sunshine Book Ltd. v. Temple University*, 697 F.2d 90 at 93 n. 9 (3d Cir.1982) (citing *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068 (3d Cir. 1978)).

**9.** Variable costs are costs that vary with changes in output. The average variable cost is the sum of all variable costs divided by output. 88 Harv.

**10.** Marginal cost is the increment to total costs that results from producing an additional increment of output. *Id.*

**11.** The Third Circuit again refused to embrace the Areeda-Turner analysis or a modified version of it in *Sunshine Books, Ltd. v. Temple University*, 697 F.2d, *supra* at 93. The court, however, did accept the analysis for purposes of appeal.

*nental Baking Co., Inc.,* 668 F.2d 1014 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982); *Chillicothe Sand & Gravel v. Martin Marietta,* 615 F.2d 427 (7th Cir.1980); *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

 "Predatory pricing is difficult to distinguish from vigorous price competition. Inadvertently condemning such competition as an instance of predation will undoubtedly chill the very behavior the antitrust laws seek to promote." *Northeastern Telephone Company v. American Telephone and Telegraph Company,* 651 F.2d 76, 88 (2d Cir.1981). It is for this reason that a court should be prudent in reading the evidence, in its determination that predatory pricing has, in fact, occurred and that it implies anticompetitive intent. The proof of predatory pricing raises a rebuttable presumption that the offending company intended, at the time it set its price, to presently forego profit so as to eliminate competition. *William Inglis,* 668 F.2d at 1034. Because it is proof of specific intent that is at issue, this court must be cautious in ascribing intent *ex post facto* based on factors that became known *after* the pricing was set. With that caution in mind, we turn to plaintiff's proof of defendant's alleged predatory pricing.

To prove predatory pricing in the case *sub judice,* plaintiff's attorneys directed an expert accountant to analyze Sonoco's accounting records [12] using the Areeda and Turner definitions of variable cost as set forth in their antitrust textbook, III P. Areeda and D. Turner, *Antitrust Law* 173 (1978). Contrary to their 1975 definition of variable costs, Areeda and Turner established that variable costs include all costs except (1) capital costs attributable to investment in land, plant and equipment; (2) property and other taxes unaffected by

output; and (3) depreciation on plant. *See* III Areeda and Turner, *supra* at 715(c). It bears noting, however, that the Third Circuit has not adopted this latter version of variable costs. In *O. Hommel Co.* the court stated that:

> Fixed costs are those which *do not* vary with changes in output, and variable costs are costs which *do* vary with changes in output. Variable costs typically include such items as materials, fuel, labor directly used to produce the product, repair and maintenance, etc.

659 F.2d at 349, n. 11 (citations omitted) (emphasis original). The court would appear to require an analysis of costs to determine which do, in fact, vary with output. "The determination of which costs are variable and which fixed will vary with the facts of each case." *William Inglis,* 668 F.2d at 1038.

Nevertheless, with the 1978 Areeda and Turner definition as the standard, plaintiff's expert reclassified some of Sonoco's costs to conform to that standard. In so doing, he placed the following costs into a category he called "additional variable costs": (1) assignable period costs; (2) plant costs; and (3) MTA costs.[13]

Assignable period costs include the salaries of Sonoco's supervisory group, plus fringe benefits, and equipment depreciation. Plant management costs include salaries and fringe benefits for plant superintendents, managers, and secretarial personnel, building depreciation, janitorial salaries, and buildings and ground maintenance. MTA costs include sales costs, regional administration, and corporate administration (including corporate medical department and mailroom, corporate personnel, and other corporate support functions). Corporate administration takes place in the company's Hartsville, South Carolina headquarters rather than the Pickney plant where the plastic machine cores are produc-

---

**12.** These accounting records included the following Profit and Loss (P & L) Statements: Plant, Master Department, Period Staff, Service Departments, and Plant Management as well as Sonoco's "Direct Product Cost" sheets.

**13.** "MTA" stands for marketing, technical and administrative costs.

ed. MTA also includes divisional administration, corporate interest, and technical development.

The extent to which some or all of these costs are variable is in doubt. In its own post-completion review, a Sonoco employee stated that incremental MTA and overhead costs "do tend to increase over time with volume as experience has clearly demonstrated." (DH. Ex–172 at 100326). That statement fits the definition of variable costs since they are costs that tend to increase with volume. In a deposition, the author of the report explained that such increases were probably in allocations based on increased capital investments. He testified that he was without information to conclude that such costs had experienced actual cash increases.

■ Traditionally, management expenses and irreducible overhead are considered fixed rather than variable. *Sunshine Books*, 524 F.Supp. at 482; *Northeastern Telephone Company v. American Telephone and Telegraph Company*, 651 F.2d 76, 86. Of course, a company's experience is the most telling evidence of the category into which costs belong. Sonoco's general manager of its plastics division testified that when the plastic core equipment was installed there was an increase in assignable period costs because of depreciation costs. If operations were stopped and the equipment sold, assignable period costs would be decreased to reflect the decrease in depreciation. He further testified that none of the plant management costs changed when the equipment was installed. The installation of the equipment had some effect on MTA although most costs were fixed. He testified that of the costs labeled "additional variable costs" in plaintiff's analysis, a great majority would not vary depending on the output of the business machine cores.

Plaintiff's accounting expert also recalculated Sonoco's labor costs by increasing the number of operators from 2 to 2½. This resulted in an overstatement of direct labor costs because the plant, in fact, uses a two-person crew operating one shift.

With these recalculations, plaintiff's expert determined that Sonoco had been selling below its variable costs for plastic adding machine cores ("add cores") over a two year period by more than 10%. He also determined that the defendant was selling its paper cash register cores ("cash cores") and paper add cores to NCR below its average variable cost by 25%–38% on add cores and 4% on cash cores since October, 1980.

■ Defendant challenges both the recalculations performed by plaintiff's expert and the conclusions to be drawn from its own documents introduced at trial. The challenges to the plaintiff's expert go to the weight to be given the evidence of predatory pricing. *D & S Redi-Mix v. Sierra Redi-Mix and Contracting Co.*, 692 F.2d 1245 (9th Cir.1982). This court, as the finder of fact, is unpersuaded by plaintiff's proof of predatory pricing. While it is true that the defendant has not offered its own charts and proof of pricing above average variable cost, such proof is not the defendant's burden of proof in the first instance. Defendant has sufficiently cast doubt on plaintiff's method of analysis of fixed and variable cost to require a finding by this court that predatory pricing has not been proven.

Further, even if we were to find that predatory pricing has, in fact, been shown, we are persuaded that Sonoco's pricing, including its announced increases and ultimate rescissions of price, was not done with the requisite specific intent. We would be unable, then, to conclude that the intent to be inferred from a finding of predatory pricing, were such a finding made, is justified in this case.

The documents and testimony presented by Sonoco support an inference that its behavior over the past two years has been a result of stiff competition in selling business machine cores. The intent demonstrated by the defendant is to increase sales volume. As the Supreme Court has stated, increasing sales and increasing market share are normal business goals. *U.S.*

*Steel Corp. v. Fortner Enterprises,* 429 U.S. 610, 612, n. 1, 97 S.Ct. 861, 863, n. 1, 51 L.Ed.2d 80 (1977). In the landmark Section 1 Sherman Act case of *United States v. Aluminum Company of America,* 148 F.2d 416, 430 (2d Cir.1945), Judge Hand proclaimed: "The successful competitor, having been urged to compete, must not be turned upon when he wins."

In documents from Sonoco's files, memoranda between Sonoco's sales manager and its sales force highlight the price competition it encountered when it attempted to enter the plastic machine core business. Sonoco found its slightly higher pricing problematic in its effort to achieve volume. Its attempt to increase prices was met with a good deal of customer resistance as is documented by its internal memoranda. The resulting reduced price proves no more than the fact that price is the crucial factor in the selling of business machine cores and the beneficiaries of the pricing battle are the customers. This would appear to meet the goals of the antitrust laws rather than to violate them.

Double H did suffer from Sonoco's appearance on the scene. Rather than passively receiving orders and neglecting to "make house calls," it was forced to venture into its market and exhibit its wares. Its discomfort with competition, while sympathetic, does not automatically rise to victimization by a large, ill-intended corporation.

The pricing of Sonoco's fiber cores, at first glance, would appear predatory in that it sold its fiber add cores to NCR below its direct product cost. It has, however, sold its fiber cash register cores at a profit. The bulk of Sonoco's sales to NCR is cash register cores. When both fiber add cores and cash register cores are combined, Sonoco's fiber core line remains profitable. Its expressed intent to have NCR switch to Sonoco plastic cores, if and when that switch occurs, is a normal, in fact, expected business goal. Sonoco has successfully raised its prices to NCR even though it has met with their resistance. Its documented efforts to raise its price to NCR for its fiber cores belies the conclusion that it has intentionally sold below cost to keep NCR from switching to plastic so long as Double H is in the picture.

■ Double H also contends that Sonoco's effort to acquire Double H is another example of its anticompetitive conduct. Plaintiff points to Sonoco's effort to have Harry Harp and his sons sign a covenant not to compete as evidence of its intent. Yet, such a covenant is universally accepted as valid so long as it is reasonable. *Westec Security Services, Inc. v. Westinghouse Electric Corp.,* 538 F.Supp. 108, 122 (E.D.Pa.1982).

Finally, documents in Sonoco's files indicate that they expected their market share for the next five years to be heavily influenced by Double H. Double H's market share is projected at remaining at 60% for 1982–1986 while Sonoco's projected share is 30% for 1982–83, 31% for 1984–85 and 32% for 1986. (Defendant's Exhibit 305). The intent that can readily be inferred from this mid-1979 calculation is that of competition with Double H rather than its elimination.

Having found that plaintiff did not meet its burden in proving specific intent or anticompetitive conduct, this court need not reach the question as to whether or not there was a dangerous probability of Sonoco succeeding in its alleged attempt to monopolize.

### III. LEGAL ANALYSIS: ROBINSON–PATMAN ACT

To establish a prima facie case of unlawful price discrimination under the Robinson-Patman Act, the plaintiff must show that: (1) the defendant has discriminated in the prices it has charged different customers for goods of "like grade and quality"; (2) the defendant is engaged in commerce and the sale was made in commerce; (3) the effect of such discrimination may be substantially to reduce competition or tend to create a monopoly. *Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 119 (3d Cir.1980). Once a plaintiff has estab-

lished a prima facie case, defendant may rebut it by affirmatively proving that the discrimination was justified in a good faith effort to meet competition from others.[14]

■ In addition to proving a violation of the Robinson-Patman Act, to recover, the plaintiff must prove that he has actually been injured in his business or property under Section 4 of the Clayton Act. 15 U.S.C. § 15. Proof of a violation of § 2(a) of the Robinson-Patman Act does not allow a court to presume damages. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 563, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981).

■ It is not disputed in this case that Sonoco sold fiber business machine cores to NCR below the prices at which it sold the products to other customers. Nor is there a dispute that the sales were "in commerce." Defendant argues that the evidence presented by the plaintiff is insufficient to carry the burden of proof as to whether or not competitive injury has resulted. There are two basic means of meeting the competitive injury requirement: (1) actual competitive injury shown by market analysis; (2) predatory intent from which competitive injury may be inferred. *O. Hommel Co.*, 659 F.2d at 347. In determining competitive injury, it is the detrimental effect *on competition*, rather than a concern with individual *competitors* that is the focus. *Id.* (emphasis original) (citation omitted).

In the present case, the plaintiff has not offered evidence as to the effect Sonoco's price discrimination has had on market shares for the business machine core business generally. It has theorized, however, that such price discrimination "has precluded the competition that would otherwise exist among [sic] Double H and Sonoco for sales of cash register cores, both to NCR and to smaller customers who will not switch to plastic until NCR leads the way." (Plaintiff's Post-Trial Memorandum, p. 38). A similar theory of NCR's leadership posi-

tion is expressed in an internal memorandum in which Sonoco's general manager of its plastics division states: "The main account on Group 1 (cash register) cores is N.C.R. and they have elected to stay with the paper cores until the economics favor switching to plastics. The remainder of the marketplace is reluctant to switch until N.C.R. makes the change." (P.Ex. DH–135 at 100382). By defendant's own admission, it was Sonoco's intent to retain NCR with the expectation that other paper converters would not convert to plastic until NCR did.

■ Testimony of NCR personnel confirms the fact that economics is the crucial factor in keeping NCR from switching from paper to plastic cash cores. The testimony reveals that while other companies have occasionally attempted to sell plastic cores to NCR, they are unable to compete with Sonoco's prices. (Eggleston Dep. at 7–8, 40–43). Defendant points to evidence that some paper converters have, in fact, switched from paper to plastic cores. (Eggleston Dep. at 8, Harp Tr. 50). It is defendant's argument that because NCR has not, in fact, maintained a leadership position, no competitive harm has been shown.

We find, however, that the statements that one or two converters have switched to plastic cores is insufficient to disprove competitive harm. Further, the intent expressed in the Sonoco document, sufficiently establishes predatory intent in Sonoco's effort to retain NCR as a paper cash core customer thereby forestalling the industry-wide switch from paper to plastic. From the finding of predatory intent we may infer injury to competition. *O. Hommel Co.*, 659 F.2d at 347, citing *Pacific Engineering & Prod. Co. v. Kerr-McGee Corp.*, 551 F.2d 790, 798 (10th Cir.1977), *cert. denied* 434 U.S. 977, 98 S.Ct. 543, 54 L.Ed.2d 472 (1977).

Because plaintiff has established a *prima facie* case of violation of Section 2(a) of

---

**14.** *Provided, however,* that nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price ... to any purchaser ... was made in good faith to meet an equally low price of a competitor.... 15 U.S.C. § 13(b).

the Robinson-Patman Act, we turn to the defendant's proof of its affirmative defense: that the illegal price discrimination was made in a good-faith effort to meet competition. "The test for determining when a seller has a valid meeting competition defense is whether a seller can 'show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor.'" *Great Atlantic & Pacific Tea Co., Inc. v. FTC,* 440 U.S. 69, 82, 99 S.Ct. 925, 934, 59 L.Ed.2d 153 (1979) (quoting *FTC v. A.E. Staley Mfg. Co.,* 324 U.S. 746, 759–760, 65 S.Ct. 971, 977, 89 L.Ed. 1338 (1945)). "A good faith, rather than absolute certainty, that a price concession is being offered to meet an equally low price offered by a competitor is sufficient to satisfy the § 2(b) defense." *United States v. United States Gypsum Co.,* 438 U.S. 422, 453, 98 S.Ct. 2864, 2881, 57 L.Ed.2d 854 (1978).

 The conduct required of the seller asserting the defense has been discussed by the Supreme Court and the Third Circuit. In its landmark case of *FTC v. Staley,* 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338 (1944), the Supreme Court found that the defendant had failed to rebut the prima facie price discrimination suit established against it because it presented no evidence that the company's salesmen, after receiving verbal information that its competitors had offered a lower price, made any effort to investigate or verify the information. *FTC v. Staley,* 324 U.S. at 758, 65 S.Ct. at 976. Nor was evidence presented that the salesmen had "knowledge of their informant's character and reliability." *Id.* There was an "entire absence of any showing that respondents had taken any precaution to conduct their business in such a manner as to prevent unwarranted discriminations in price." *Id.* at 759, 65 S.Ct. at 977. The mere acceptance of the word of a company official, without corroboration by investigation or verification, is insufficient to prove good faith. *Viviano Macaroni Co. v. F.T.C.,* 411 F.2d 255, 259 (3d Cir. 1969).

Because there is fear that direct price communication between competitors will lead to the evils of price collusion, *Great Atlantic & Pacific Tea Co. v. FTC,* 440 U.S. at 82, 99 S.Ct. at 934, some limits on price verification are necessary. What is required is a showing of reliability of the informant who has personal knowledge of the bidding, coupled with an attempt to investigate by asking for more information about the competitive bid and the making of a credible threat of termination of purchases in the absence of a second offer. *Id.* at 84, n. 17, 99 S.Ct. at 935, n. 17.

In the case *sub judice* Sonoco has presented evidence that it was warned of the loss of NCR's business. NCR's purchasing agent, James T. Eggleston, told a Sonoco employee that its prices were higher than Crescent's for paper cores. Eggleston was unable, in a deposition, to recall in detail the amount of information he gave Sonoco. He testified that he would have given Sonoco a percentage range of the amount Sonoco's price exceeded Crescent's price. There was, at that time, a proposed price increase by Sonoco presented to NCR to which NCR reacted negatively. (Eggleston dep. at 27). Sonoco records show that, in reaction to being told that Crescent bid lower, it rolled back its prices to their level as of January, 1980 as requested by Eggleston. Sonoco's own records indicate it did so "to meet competitive pricing from Crescent." (Defendant's Exhibit 347).

There is no evidence in the record that any Sonoco employee attempted to verify the existence of a Crescent lower price. Without a diligent attempt to verify the purported lower price by Crescent, Sonoco has not met the good faith standard set forth in *Staley* and *Vivano.* All that is established by defendant's evidence is that NCR negotiated a lower price for itself by presenting to Sonoco personnel an approximation of a competitor's lower price. Sonoco relies on its fear of losing business to Crescent as evidence of its good faith. Documents obtained from Sonoco's files indicate that, at least in 1978, it believed it

had no competition for NCR's business. (Plaintiff's Exhibit DH–19 at 100125). Sonoco has produced no evidence that it believed that by 1981 its competition had changed so that threats by NCR to give its business to Crescent could reasonably be believed to be true. The testimony of Eggleston that Crescent does sell it "some high-volume items as well as low" (Eggleston Dep. at 35–36) is not sufficient to establish Sonoco's state of mind at the time it gave the discriminatory price.

■ Because Double H has established a *prima facie* case of unlawful price discrimination and defendant has failed to meet its burden in proving the unlawful price was given in a good-faith effort to meet competition, we find that Sonoco has violated Section 2(a) of the Robinson-Patman Act. The issue of actual injury to Double H will be discussed in Section V.

## IV. STATE LAW CLAIM

Plaintiff argues that once it has established an antitrust violation under either § 2 of the Sherman Act or § 2(a) of the Robinson-Patman Act, it has sufficiently proven the Pennsylvania common law tort of intentional interference with its prospective business relations. Because we find that the requisite proof for damages has not been made for the Robinson-Patman violation, and plaintiff relies on the same proof for the common law claim, we shall not decide the tort allegations. Instead, we shall turn to the issue of damages.

## V. DAMAGES: ROBINSON–PATMAN VIOLATION

■ It is plaintiff's argument that the proof of damages is substantially relaxed once it has established the elements of liability under the antitrust laws, citing *Rea v. Ford Motor Co.*, 497 F.2d 577, 591–92 (3d Cir.1974), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). While it is true that a court is required to "observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for damages from a partial or total exclusion

from a market," *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89. S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969), we must be presented with "some showing of actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co. v. Chrysler Motor Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981). Because proof of a violation of § 2(a) of the Robinson-Patman Act "establishes only that injury *may* result," *id.* (emphasis original), more proof is necessary for plaintiff to recover damages.

In the case *sub judice* the only evidence submitted toward proving plaintiff's damages under the Robinson-Patman Act, the only antitrust violation determined to have occurred, was Mr. Harp's testimony that he could have realized a 10% profit had he made sales to those cash core customers who had not switched from paper to plastic due to the unlawful price as well as to NCR. The speculative nature of both his profit margin of 10%, which he admits to having come "out of the air," and the extent to which he could have captured those customers, requires that this court find that plaintiff's case fails for lack of proof.

■ Nowhere does plaintiff present any evidence that it could have made additional sales to NCR. As noted earlier, price was a crucial factor to NCR's purchasing agent. The plaintiff has not shown this court at which price it could have offered plastic cores so as to encourage NCR to make the switch to plastic. Further, the more likely occurrence presented by the evidence is that, had Sonoco offered its paper cores to NCR at the same price it offered them to its other customers, NCR would have bought from Crescent. There is no evidence that Double H would have sold plastic cash register cores at prices that could compete with paper cash register cores. The fact that it has not yet sold a significant amount of such cores does not prevent it from presenting to this court some reasonable estimate of the price for which they could be sold. It is mere speculation that, had Sonoco not sold at an unlawful

price, Double H would have captured all of the volume of sales to NCR. It is even more speculative that Double H could then have captured the rest of the cash register core market.

In *J. Truett Payne* the Supreme Court reviewed two earlier cases in which damages were inferred from the evidence. In *Zenith* the court found the evidence sufficient to support a jury finding of damages where the plaintiff had compared its sales in Canada, where it was subject to an antitrust violation, with it sales in the United States, where it was not. In *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), "the plaintiff adduced evidence not only comparing its profits with a competitor not subject to the violation but also comparing its profits during the time of the violation with the period immediately preceding the violation." *J. Truett Payne Co.*, 451 U.S. at 567, 101 S.Ct. at 1930. In comparing those cases with the evidence presented by the plaintiff in *J. Truett Payne* the court noted that the testimony of the petitioner's owner and an expert witness were not supported by documentary evidence as to the effect of the discrimination on retail prices. *Id.* at 564, 101 S.Ct. at 1928. The owner of the car dealership testified that the discrimination caused him to "overallow" on trade-ins, thus reducing his profits on his used car operation. The expert testified that the discrimination would ultimately cause retail prices to be held at an artificially high level and that petitioner made less money per car than its competitors. *Id.* This evidence was determined by the court to be weak even if construed favorably to the petitioner. *Id.* at 565, 101 S.Ct. at 1929.

On remand, the Court of Appeals, in examining the evidence on damages, which included an estimate of goodwill and projections of profit based on past earnings, found that it contained "self-serving and unsupported assumptions" and that the plaintiff "relied on nothing more than the mere fact of alleged price difference and the hypothesized effect of the difference on its business." *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.*, 670 F.2d 575, 582 (5th Cir.1982). The court ordered the district court to enter a judgment for the defendant based on plaintiff's lack of proof of damages.

The plaintiff in the case *sub judice* has presented even less evidence to support an award for damages. The plaintiff's expert did not even analyze the damages issue in regard to the Robinson-Patman claim based on foreclosure from the cash register core market. Mr. Harp's testimony that he lost a 10% profit on the entire volume of sales by Sonoco to NCR is certainly without support.

■ Double H, in addition to requesting treble damages, has asked for injunctive relief. At this point, of course, we need to deal with such relief only with respect to the Robinson-Patman Act violation. The question that arises is whether this court can impose a permanent injunction once it has found that the Robinson-Patman Act has been violated but the plaintiff has failed to prove actual injury to itself.

Injunctive relief is an equitable remedy provided for under § 16 of the Clayton Act, 15 U.S.C. § 26. The remedy invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of "threatened injury" [and is] characteristically available even though the plaintiff has not yet suffered actual injury." *Zenith Corporation*, 395 U.S. at 130, 89 S.Ct. at 1580 (citation omitted). To obtain relief under § 16, the plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Id.*

In the *Zenith* case itself the Supreme Court did find that injunctive relief was proper only after finding that treble damages were properly awarded by the District Court.

While the language in *Zenith Corporation* is somewhat equivocal, it would appear that a significant threat of injury or the fact of injury is still required for relief. Because Double H has been unable to dem-

onstrate injury or threat of injury to itself, injunctive relief shall be denied.

## VI. CONCLUSIONS

Because plaintiff has failed to present sufficient evidence to support an award, even under the relaxed damages rules of antitrust law, *see J. Truett*, 451 U.S. at 567, 101 S.Ct. at 1929, this court shall enter judgment in favor of the defendant and against the plaintiff on the Robinson-Patman claim. The state law claim also must fail for lack of proof of damages. Finally, we shall enter judgment for the defendant and against the plaintiff on the Sherman Act claim due to plaintiff's failure to present sufficient evidence to persuade this court that the defendant had the requisite specific intent.

The above constitutes this court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.