**DOUBLE H PLASTICS, INC., Appellant,**

v.

**SONOCO PRODUCTS COMPANY,**
**Appellee.**

**No. 83–1111.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 15, 1983.

Resubmitted Before Original Panel
Pursuant to Third Circuit Rule 12(6)
Jan. 9, 1984.

Decided April 20, 1984.

Rehearing and Rehearing En Banc
Denied April 23, 1984.

Webster & Sheffield, New York City, and Lloyd S. Clareman (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellant.

Franklin Poul, Wolf, Block, Schorr & Sol- is-Cohen, Philadelphia, Pa., and Samuel K. Abrams, Gerald A. Connell, Lee H. Simow- itz (argued), Brian E. Moran, Baker & Hos- tetler, Washington, D.C., for appellee.

Before SEITZ, Chief Judge, and GIB- BONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge:

Plaintiff Double H Plastics, Inc., appeals from a final order of the district court entering judgment in favor of the defend- ant Sonoco Products Company on the plain- tiff's claim under section 2(a) of the Robin- son-Patman Act, 15 U.S.C. § 13(a) (1982). We have jurisdiction under 28 U.S.C. § 1291.

### I.

The plaintiff and defendant are competi- tors in the business of producing and sell- ing business machine cores, small spools that carry the paper used in adding ma- chines, cash registers, and other business machines. Slight differences in diameter distinguish the cores used in each type of machine. Traditionally the spools were made of paper, but since the mid-1970s various companies have made them of plas- tic. The new plastic cores have taken over the adding machine market, capturing 90% of the dollar volume of sales in 1980, but to

date the cores have been less successful in the cash register market.

The plaintiff, through the knowledge and skill of its major shareholder Mr. Harry Harp, was a pioneer in producing and marketing plastic cores, and the company enjoyed great success in the late 1970s, eventually winning approximately 70% of the overall plastic core market. The other producers of plastic cores are the defendant, Vulcan Corporation, and Southern Metals & Plastics. Vulcan's percentage of the market has declined dramatically in the last few years, from 11.2% in 1980 to 2.2% in 1982, while Southern Metals & Plastics has experienced increasing success, going from 9.4% of the market in 1980 to 16.5% in 1982.[1]

The defendant, as the major producer of paper cores, has been a victim of the plaintiff's success in building the plastic core market. In 1978 the defendant contacted Mr. Harp and began negotiations to acquire the plaintiff company. These negotiations ended in 1979 when Mr. Harp rejected the defendant's offer. Thereafter the defendant acquired its own equipment and in 1980 began producing and selling plastic cores to compete in the adding machine market.

The defendant's major customer in the paper cash register core market is NCR Corp. For reasons that remain unclear, NCR has continued to buy paper cores from the defendant despite the fact that in recent years the plaintiff has offered to sell plastic cores at prices 11–12% lower than paper core prices. For example, in 1981 NCR purchased paper cores from the defendant at $9.59 per thousand, although the plaintiff was offering plastic cores at only $8.12. The evidence indicates that, economics aside, plastic cores are a suitable substitute for paper cores in cash registers.

The defendant sells its paper cash register cores at two prices, charging a lower price to NCR and a higher price to its other cash register customers. For example, in 1981 the defendant's price to NCR was $9.59 per thousand and $11.33 to other buyers. The defendant has admitted that the price difference is not cost-based.

NCR's refusal to switch to plastic is a problem for the plaintiff, because NCR is regarded as an industry leader. Many of the smaller buyers of cash register cores have refused to switch to plastic until NCR does so, and the plaintiff is therefore unable to make sales to a large segment of the cash register market. Despite this failure to invade the cash register core market, however, the plaintiff remains a successful company, making 65–70% of all plastic core sales in 1981 and 1982.

## II.

In 1982 the plaintiff filed antitrust claims against the defendant under section 2 of the Sherman Act, 15 U.S.C. § 2 (1982), and section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a) (1982). The plaintiff based its Sherman Act claim on allegations that the defendant had sold both plastic and paper cores at predatory prices. The district court entered judgment in the defendant's favor on this claim, and the plaintiff has not appealed.

In its Robinson-Patman Act claim the plaintiff alleged that the defendant had sold paper cash register cores to NCR at illegally discriminatory prices. The district court agreed that the defendant had violated the Act but nonetheless ruled in the defendant's favor on the grounds that the plaintiff had failed to establish "actual injury" and damages. The plaintiff appeals from the order entering judgment on this claim.

## III.

The plaintiff argues that it produced sufficient evidence at trial to prove actual injury and damages under the Robinson-Patman Act. The defendant rejects this contention and argues in addition that we

[1]. The 1982 figures are based on the companies' performances during the first six months of that year.

may affirm the district court's order on the ground that the court was in error in finding a violation of the Act in the first instance. We need only consider this last contention.

In order to prove a violation of section 2(a) of the Robinson-Patman Act, the plaintiff must satisfy the jurisdictional requirements (not at issue in this case) and then establish the existence of a price discrimination and an illegal effect on competition. von Kalinowski, 4 *Antitrust Laws and Trade Regulation* § 23.02 (1983).

■■■ The Supreme Court has ruled that any difference in price for the same product is a price discrimination. *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960). As this court has previously recognized, however, "[p]rice discrimination is not illegal per se." *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 346 (3d Cir.1981). In order to establish a violation of section 2(a), the plaintiff must show that the price discrimination either injured or threatened to injure competition. *Id.* The plaintiff may do this either by market analysis or by proof of predatory intent. *Id.* at 347. Here the plaintiff has offered no market analysis and instead has relied on evidence of predatory intent. Predatory intent may be shown either by express evidence or by inference from below-cost pricing. *Id.* In the portion of its opinion considering the plaintiff's Sherman Act claim, the district court concluded that the defendant did not sell paper cores to NCR at prices below cost, and the plaintiff has not challenged that finding on appeal. The plaintiff's case therefore turns on express evidence of predatory intent.

In *O. Hommel* we explained that "[t]he legislative history of the Clayton Act indicates that predatory intent is an intent to destroy a rival with the ultimate purpose of acquiring a monopoly in a particular locality." *Id.* at 347. We therefore concluded that "express evidence of predatory intent should demonstrate the alleged predator's intention of sacrificing present revenues with the hope of obtaining monopoly profits." *Id.* at 348.

■■■ Before reviewing the plaintiff's evidence of predatory intent to determine whether it satisfies the requirement of *O. Hommel*, it is important to note the standard by which our review must be conducted. "Intent" in this case is a question of fact, and a reviewing court must respect the lower court's findings of fact unless those findings are clearly erroneous. Fed. R.Civ.P. 52(a). This standard applies both to findings "that deal with 'ultimate' and those that deal with 'subsidiary' facts." *Pullman-Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

The district court based its finding of predatory intent primarily on one document, a Sonoco internal memorandum in which the defendant's general manager stated that "[t]he main account of [cash register] cores is N.C.R. and they have elected to stay with the paper cores until the economics favor switching to plastics. The remainder of the marketplace is reluctant to switch until N.C.R. makes the change." From this document the district court concluded that "it was Sonoco's intent to retain NCR with the expectation that other paper converters would not convert to plastic until NCR did." *Double H Plastics, Inc. v. Sonoco Products Co.*, 575 F.Supp. 389, 391 (E.D.Pa.1983). The district court also relied on the testimony of NCR officials that "economics [were] the crucial factor in keeping NCR from switching from paper to plastic cash cores. The testimony reveals that while other companies have occasionally attempted to sell plastic cores to NCR, they are unable to compete with Sonoco's prices." *Id.* at 398. On the basis of this evidence, the district court concluded that the plaintiff had es-

tablished "predatory intent in Sonoco's effort to retain NCR as a paper cash core customer thereby forestalling the industry-wide switch from paper to plastic. From the finding of predatory intent we may infer injury to competition." *Id.*

We agree with the district court that the evidence clearly establishes the defendant's awareness that NCR was an industry leader in the purchase of cash register cores and that other manufacturers of cash registers would not switch from paper to plastic cores until NCR did so. The evidence, however, establishes no more than this. The internal memorandum on which the district court relied states simply that (1) NCR is the defendant's major paper core customer, (2) "economics" will determine whether NCR stays with paper cores or switches to plastic, and (3) other members of the market will not switch until NCR does so. There is nothing in this document that suggests that the defendant's primary purpose in offering the discount to NCR was to injure the plaintiff. Instead, the document simply reveals that the defendant was aware of the realities of its own marketplace, and evidence of such awareness, standing alone, cannot support an inference of predatory intent.

There is no basis in any of the documents or testimony for inferring that the defendant offered the discount to NCR for reasons not within the bounds of sound and legal business judgment, nor is there any evidence that the defendant could reasonably have believed that the retention of the cash register core business would either force the plaintiff out of business or compel it to compete less vigorously. To the contrary, there is reason to believe just the reverse. The district court, in the unchallenged portion of its opinion addressing the Sherman Act claim, concluded that the defendant's sales to NCR were profitable and that the defendant's pricing policies were the result of "stiff competition". *Id.* at

396. The defendant's intent was simply "to increase sales volume", which is a normal business goal. *Id.* Noting the continued strong showing by the plaintiff in the business core market generally, the district court concluded that "[t]he intent that can readily be inferred ... is that of competition with Double H rather than its elimination." *Id.* at 397.[2]

On the basis of this record, the plaintiff has failed the test set forth in *O. Hommel.* There is no evidence to support a factual inference that the defendant is sacrificing present revenues for the purpose of injuring the plaintiff. The discount itself cannot support such an inference unless we are to reject the holding of *O. Hommel* and conclude that price discrimination is indeed a per se violation of the Robinson-Patman Act. Neither is there any evidence that the plaintiff was injured beyond the mere loss of the cash register customers. The plaintiff is, and by all reckoning will remain, a strong competitor of the defendant's for the sale of cash register cores. The mere failure to gain new customers in this market cannot entitle the plaintiff to recover, else the free market system itself would be illegal.

For these reasons, and based on a review of the entire record, we are left with the "definite and firm conviction that a mistake has been committed" on the issue of the defendant's intent to engage in predatory pricing as proscribed by the Robinson-Patman Act. We conclude that the defendant did not violate the Act, and we will affirm the district court's judgment against the plaintiff on that ground.

## IV.

The order of the district court entering judgment in favor of the defendant will be affirmed. The plaintiff shall bear the costs of this appeal.

---

**2.** The portions of the district court's opinion from which we have quoted deal with the plaintiff's claims against the defendant under section 2 of the Sherman Act, not section 2(a) of the Robinson-Patman Act. The quoted passages set forth the court's findings of fact, however, and are relevant here because the two claims against the defendant rested on roughly the same set of facts.

GIBBONS, Circuit Judge, dissenting:

Double H. Plastics, Inc., a primary line competitor of Sonoco Products Co., appeals from a judgment in favor of Sonoco in Double H's action for damages and injunctive relief for Sonoco's violation of section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a) (1982). The case was tried to the court. Double H contends that the court's finding of a violation of section 2(a) is not clearly erroneous, but that the finding that it suffered no injury to its business or property from that violation is clearly erroneous. Double H also contends that the court erred as a matter of law in denying injunctive relief. Sonoco defends the trial court's factfinding on injury and its decision to deny injunctive relief, but as an alternative ground for affirmance contends that the court's finding of a violation of section 2(a) is clearly erroneous. The majority concludes that the court's finding of a section 2(a) violation is clearly erroneous. Thus it does not reach Double H's remaining contentions. I dissent from the judgment affirming the judgment in favor of Sonoco, because the trial court's finding of a section 2(a) violation is not clearly erroneous, and Double H's remaining contentions are meritorious.

## I.

Double H manufactures plastic cores for rolls of paper tape used in adding machines and cash registers. Sonoco manufactures fiber cores used for the same purpose, and has since January of 1980 also made plastic cores. The business of manufacturing plastic cores has developed since 1974, when Harry Harp and his wife founded Double H. Plastic cores have advantages over fiber cores, of being light weight, dust free, and favorably priced. Between 1974 and 1980 Double H made substantial inroads in the market for adding machine cores, but was less successful in the cash register market.

In 1978 Sonoco attempted unsuccessfully to acquire Double H from Mr. Harp. When that effort failed it entered the business of making and selling plastic cores. With this development Sonoco became a competitor of Double H in the sale of plastic cores, while Double H remained a competitor of Sonoco in the sale both of plastic cores and of fiber cores, which plastic frequently displaced. Other competitors in the core market included Vulcan Corporation (plastic), Southern Metals & Plastics (plastic) and Crescent Paper Tube Co. (fiber).

Double H's Robinson-Patman Act charge involves efforts by Sonoco to preserve National Cash Register Company (NCR), and other cash register manufacturers, as purchasers of fiber cores. NCR is the largest seller of cash registers. It elected to use fiber cores for most of its needs. There is evidence that Sonoco sold fiber cores to NCR at prices below its list prices and lower than the prices offered to other customers. There is evidence, as well, that NCR informed Sonoco that from a utility viewpoint plastic cores were an acceptable substitute, App. at 689–90. A Sonoco internal memorandum, Exhibit DH 129, dated February 25, 1980, notes about NCR:

In view of the price difference between paper and plastic, they plan to continue with paper cores. They also stated that economics will dictate the type core they will use. They have tested our plastic cores as well as Double H cores and found them to be satisfactory. The only real advantage they found in plastic was no paper dust and lighter in weight. Jim [Eggleston] commented further by saying these advantages are not enough to pay a premium price for. They plan to order some additional plastic cores where the prices are about the same as paper so they can do some further testing. Jim also pointed out from time to time they buy a small quantity of cores from Crescent so they can say they have two sources of supply. They continue to be very high on Sonoco and I am confident that we receive the majority of their volume. Sales for 1979 amounted to $650,-000.

App. at 690. Another internal memorandum, Exhibit DH 135, dated June 10, 1980, notes, however:

The main account on Group 1 [cash register] cores is N.C.R. and they have elected to stay with the paper cores until the economics favor switching to plastics. The remainder of the marketplace is reluctant to switch until NCR makes the change.

App. at 708. A third Sonoco internal memorandum, Exhibit DH 151, dated March 24, 1981, records that a Sonoco representative

contacted Jim Eggleston of NCR who sez [sic] they have not moved to plastics and it remains a matter of economics. I did not want to say H & H had priced their core at paper prices and did not. Paper went up (cash reg.) 9.+% recently and we should be alert to plastic cash reg. core increases also. Jim said he certainly would contact us if anything changes.

App. at 878. The reference to H & H could be found to be either a reference to Mr. and Mrs. Harp, the owners of Double H, or a shorthand reference to their company name.

Testimony of an NCR employee tends to confirm that economics was the crucial factor in keeping NCR from switching, in 1980–81, from fiber to plastic cores. Testimony by a Sonoco employee tends to confirm that Sonoco believed in those years that the rest of the cash register marketplace would be reluctant to switch to plastic cores unless NCR did so. App. at 534–35.

There is also evidence from which it could be found that Sonoco held over ninety per cent of NCR's core business, and that its only serious competitor for that business was Crescent, which did not manufacture plastic cores. Thus it could be found that preventing a switch from fiber to plastic would not significantly benefit Crescent but would harm Double H. At the same time there is evidence that after Sonoco went into the plastic core business it experienced what it considered to be severe price competition in plastic cores from Double H. Exhibit DH 135 records that "[p]ricing of this [plastic] product line continues to be a problem with our major competitor [Double "H"] holding down the market price."

The trial court began its analysis by noting that in order to establish a prima facie case of violation of section 2(a) of the Robinson-Patman Act a plaintiff must prove: (1) discrimination among customers in prices charged for sales of goods of like grade and quality; (2) such sales in interstate commerce; and (3) that the effect of the discrimination may be substantially to reduce competition or tend to create a monopoly.[1] In this case there was no real issue about the fact of discrimination in the pricing of fiber cores sold to NCR, or about such sales being in interstate commerce. The disputed issue, with respect to Double H's prima facie case was the sufficiency of its evidence on the third element, possible effect on competition. The court noted:

There are two basic means of meeting the competitive injury requirement: (1) actual competitive injury shown by market analysis; (2) predatory intent from which competitive injury may be inferred.[2]

App. at 1989.

Noting that Double H offered no evidence on the effect of Sonoco's price discrimination in favor of NCR on market shares in the business machine core business generally, the court turned to the one remaining disputed issue, evidence of predatory intent, from which likelihood of injury to competition may be inferred.

The trial court found a predatory intent on Sonoco's part, in discriminating in the prices charged to NCR, from the fact that

---

1. The court relied, in outlining the elements of a prima facie case, on *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105, 119 (3d Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

2. The court relied, for these alternative means of proving likelihood of injury to competition, on *O. Hommell Co. v. Ferro Corp.*, 659 F.2d 340, 347 (3d Cir.1981), cert. denied, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982).

Sonoco intended to retain NCR as a fiber core customer for the cash register business in order to forestall an industry-wide switch to plastic cores.

The exhibits and other evidence referred to above, while perhaps not compelling a conclusion that Sonoco granted NCR price discrimination for the predatory purpose of preventing an industry-wide switch to plastic cores, certainly tend to support that conclusion. The court's conclusion as to Sonoco's intent in granting the price discrimination is a finding of fact, as to which Fed.R.Civ.P. 52 applies. The courts of appeals have recently been admonished that the task of determining from the evidence what intent motivated a given action is for the initial factfinder, not for the reviewing court. *Pullman-Standard v. Swint,* 456 U.S. 273, 284–293, 102 S.Ct. 1781, 1788–92, 72 L.Ed.2d 66 (1982). Given the deferential standard of review mandated by Rule 52 and the record evidence referred to above, I cannot say that the trial court erred in finding predatory intent. Such an intent permits an inference of the likelihood of competitive harm.[3] Thus I would accept the trial court's legal conclusion that Double H made out a prima facie case of a section 2(a) violation.

The majority acknowledges that NCR's refusal to switch to plastic is a problem for Double H because NCR is regarded as a leader in the cash register industry, and until it switches smaller cash register manufacturers will not do so. Thus it acknowledges that by preventing such a switch Sonoco effectively forecloses the cash register market to Double H. Nevertheless, the majority concluded that

> [t]here is nothing in [Exhibit 708] that suggests that the defendant's primary purpose in offering the discount to NCR was to injure the plaintiff. Instead, the document simply reveals that the defendant was aware of the realities of its own

marketplace, and evidence of such awareness, standing alone, cannot support an inference of predatory intent.

At 355. This is a blatant example of the appellate factfinding which Rule 52 prohibits. Moreover the inference which the district court drew is far more likely than that which the majority draws. There is in this record virtually no evidence of any other purpose in giving a price discrimination to NCR than Sonoco's desire to continue to exclude Double H's product from the entire cash register market. If evidence of an intention to preclude Double H's product from an entire product market is not evidence of predatory intent, what evidence would satisfy the majority? The plain fact is that the majority disagrees with the economic decision made by Congress in applying Section 2(a) to primary line competition, and is determined to establish an impossible evidentiary standard.

Having concluded that Double H had established a prima facie case, the court turned to Sonoco's evidence in support of the affirmative defense, provided in section 2(b) of the Act, of a good faith effort to meet competition, 15 U.S.C. § 13(b) (1982), a defense which the majority does not reach. That evidence was directed toward convincing the trial court that the price discrimination was directed not against Double H, its competitor in the plastic core business, but against Crescent, its competitor in the fiber core business. It consisted of testimony that NCR's purchasing agent, James T. Eggleston, told a Sonoco employee at one point that Sonoco's prices for paper core were higher than Crescent's. The occasion of the conversation was a proposed 1980 Sonoco price increase, to which NCR reacted negatively. Sonoco Exhibit 332. When told of Crescent's lower prices, Sonoco, according to Sonoco Exhibit 347, rolled back its NCR prices to

---

3. *O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340, 347 (3d Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982). The *O. Hommel* case involved the so-called double inference issue: whether below cost pricing would support an inference of predatory intent, which would in turn support an inference of injury to competition. That issue is not presented here. The trial court relied on direct evidence of Sonoco's intention in granting price discrimination to NCR.

their prior levels. The trial court, however, noted:

There is no evidence in the record that any Sonoco employee attempted to verify the existence of a Crescent lower price. Without a diligent attempt to verify the purported lower price by Crescent, Sonoco has not met the good faith standard set forth in [FTC v.] *Staley* [324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338 (1945)]. All that is established by defendant's evidence is that NCR negotiated a lower price for itself by presenting to Sonoco personnel an approximation of a competitor's lower price. Sonoco relies on its fear of losing business to Crescent as evidence of its good faith. Documents obtained from Sonoco's files indicate that, at least in 1978, it believed it had no competition for NCR's business. (Plaintiff's Exhibit DH–19 at 100125). Sonoco has produced no evidence that it believed that by 1981 its competition had changed so that threats by NCR to give its business to Crescent could reasonably be believed to be true.

App. at 1994–95. Exhibit DH–19 to which the trial court refers is an internal Sonoco memorandum dealing with prospects for a number of products. It lists five customers for business machine cores, including NCR, and with respect to NCR lists "type of competition" as "None." There is deposition testimony by Eggleston that Crescent did sell "some high-volume items [to NCR] as well as low," but the court rejected it as "not sufficient to establish Sonoco's state of mind at the time it gave the discriminatory prices." There is also the reference in Exhibit DH 129, quoted above, to the fact that "Jim [Eggleston] also pointed out from time to time they buy a small quantity of cores from Crescent so they can say they have two sources of supply." The memo continues: "They continue to be very high on Sonoco and I am confident that we receive the majority of their volume." App. at 690.

The trial court concluded that Sonoco failed to meet its burden in proving that the unlawful price was given in a good faith effort to meet competition. Sonoco urges that this conclusion is clearly erroneous. I do not agree. There is evidence that Sonoco had over 90% of NCR's business, that it was confident of keeping that business, and that its concern was with competition from plastic cores, not from fiber cores manufactured by Crescent. Thus the record required the drawing of inferences as to Sonoco's good faith in meeting competition. The record evidence might well have permitted the factfinder to draw a different inference than that which was drawn, but that task is foreclosed to us by Rule 52.

I conclude, therefore, that the trial court did not err in holding that Double H made out a prima facie case of a violation of section 2(a), which was not rebutted by Sonoco's attempt to establish the section 2(b) meeting competition defense.

## II.

Having concluded that Double H had proved a violation of section 2(a) the court turned to the separate question whether the violation was one for which it could recover damages under section 4 of the Clayton Act. The court's method of analysis was correct, for the Supreme Court has noted:

By its terms § 2(a) is a prophylactic statute which is violated merely upon a showing that "the effect of such discrimination *may be* substantially to lessen competition." (Emphasis supplied.) ... Section 4 of the Clayton Act, in contrast, is essentially a remedial statute. It provides treble damages to "[a]ny person who *shall be injured* in his business or property by reason of anything forbidden in the antitrust laws...." (Emphasis supplied.) To recover treble damages, then, a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent.

*J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 561–62, 101 S.Ct. 1923, 1926–27, 68 L.Ed.2d 442 (1981).

This was a case involving primary line competition for sales to NCR and other cash register manufacturers. The antitrust injury Double H attempted to prove was lost profits it would have made from such sales. In support of that theory of injury Double H presented the testimony of its president, Mr. Harp. That testimony established that prior to 1980–81 Double H's plastic cash register core was quality-tested and approved by NCR as fully functional. Harp also estimated that total annual sales of cash register cores by all competitors amounted to $1.5 million. Harp estimated that if price discrimination by Sonoco to NCR in 1980–81 had not discouraged an industry-wide shift to plastic, his company would have achieved a 50% market share in each year. Harp testified that Double H could anticipate 10% pretax profit on such additional sales. Thus, he estimated, Double H lost $75,000 in profits in each year that the price discrimination occurred.

The trial court rejected Double H's proof of injury, making four separate findings. Since these findings would support a judgment for Sonoco, I address them. Each is clearly erroneous.

The trial court found that "[t]he plaintiff has not shown this court at what price it could have offered plastic cores so as to encourage NCR to make the switch to plastic." To the contrary, Double H exhibits DH 60 and 81 and Sonoco exhibits 111, 112 and 113, in evidence, establish Double H's prices for cash register cores, and a comparison of those exhibits with Sonoco prices shown on its price lists show that Double H's cash register core prices were lower. *Compare* exhibit DH 81 *with* exhibits DH 170, 171. To take one example, for a 2⁵/₁₆″ cash register core, Double H's price of $8.12 per thousand is lower than Sonoco's discriminatory price to NCR of $9.59 per thousand, and much lower than Sonoco's $11.33 per thousand price charged to other customers. There is no evidence in the record impeaching these price differentials.

The trial court also found that "[t]here is no evidence that Double H would have sold plastic cash register cores at prices that could compete with paper cash register cores." To the contrary, the exhibits referred to in the preceding paragraph establish that Double H's plastic core prices for cash register cores were in fact quite favorable when compared with Sonoco's prices to customers other than NCR. Moreover, the exhibits referred to in Part I above show that Sonoco's discriminatory prices to NCR were arrived at with knowledge that only economics prevented NCR from overcoming inertia and making a product switch.

The trial court found that "[i]t is mere speculation that, had Sonoco not sold at an unlawful price, Double H would have captured all of the volume of sales to NCR. It is even more speculative that Double H could then have captured the rest of the cash register core market." Here the court misstates the testimony. Mr. Harp did not contend that Double H would capture all of NCR's business or all of the cash register core market. He made an estimate that Double H had a potential market share of fifty percent. App. at 304–05. Since exhibits originating with Sonoco establish that Double H already held 80% of the unforeclosed market in 1980, and 70% in 1981, Harp's estimate is clearly conservative rather than speculative. *See* exhibit DH 106; Sonoco exhibit 238. Indeed, Sonoco's post-trial proposed findings of fact concede Double H's success in the unforeclosed market. App. at 1750, 1859. The one market segment in which Double H was not successful was cash register cores, where NCR, the industry leader, received discriminatory prices. Given the uncontradicted evidence that there was no technical reason why NCR did not switch to plastic, the suggestion that price discrimination foreclosed Double H from the cash register core market is anything but speculative. Indeed, on the record before us no other inference is permissible, for there is no other evidence of any reason for Double H's lack of success.

Finally, the court found that Mr. Harp's projection of a 10% profit on a $750,000 a

year sales volume "is certainly without support." However, Double H's financial statements for the year 1979, 1980 and 1981 are in evidence. Exhibits DH 168, 167, 160. They establish that Double H earned pretax profits in excess of 10% on sales for a large part of its business history. Indeed, Sonoco's own projections of Double H's profitability, made in connection with its study of a possible acquisition, suggest profit margins on sales far in excess of those projected by Mr. Harp. Exhibit DH 19, App. at 618. Sonoco attempts to defend the trial court's misinterpretation of the record by referring to a remark made by Mr. Harp during cross-examination about his 10% profit estimate:

Q  Mr. Harp, from time to time both in Answers to Interrogatories in this litigation and, indeed, in your testimony you've made reference to a 10 percent profit as a percentage of sales as a reasonable profit; is that right? Where did you get that number?

A  Well, I think I got it out of the air. It's a number that I consider a reasonable profit. I didn't generate it with any special thing. I take it as a number I would not like to operate under, and I'm not too unhappy if I'm not too far over it.

Q  Mr. Harp ... Could you give the last part of that answer again.

A  I said I'm going to be unhappy if I go under the 10, and I'm not going to be unhappy if I go over it.

App. at 346–47. From this cross-examination Sonoco would have us conclude that Double H's estimate of lost profits is "certainly without support." To do so, however, we would have to disregard the Double H financial statements in evidence, and Sonoco's own acquisition study in evidence. Moreover we would have to take Mr. Harp's testimony out of context. The meaning his words convey, plainly, is that for purposes of estimating additional sales he would be satisfied with pricing which would return a net pretax profit of ten percent. Indeed the surrounding questions in the sequence show the relationship between the desired mark-up and pricing. App. at 346–50. The entire sequence shows that Mr. Harp correctly understood that the thrust of the examination was not at whether he could make profits on sales but at whether he could price his product low enough to get the sales. The 10% estimate is quite responsive, for it indicates that although, as evidenced by its financial statements, Double H had been making more than a 10% mark-up, it could price its products lower and still operate at a satisfactory level of profitability.

Section 4 Clayton Act plaintiffs who have established a violation of the antitrust laws are entitled to prove damages through " 'probable and inferential, as well as direct and positive proof.' " *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 564, 51 S.Ct. 248, 251, 75 L.Ed. 544 (1931)). Moreover, the practical difficulties facing antitrust plaintiffs attempting to show what profits they would have made had sales not been foreclosed by illegal conduct has prompted the Supreme Court to observe:

[D]amage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the fact finder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." *Bigelow v. RKO Pictures, Inc., supra,* 327 U.S. at 264, 66 S.Ct. 579. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969). Moreover, in the context of a Robinson-Patman Act case the Court has explained the reason for its willingness to relax proof of injury standards which might otherwise apply.

Our willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation. But our willingness also rests on the principle articulated in cases such as Bigelow, that it does not "come with very good grace" for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted. *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981).

The trial court's supported conclusion that unlawful price discrimination occurred places the case within the damage rules announced in the foregoing case. The trial court's conclusion that Double H's proof of injury is unsupported by evidence or, is speculative, rests on findings of fact which are clearly erroneous. The evidence to which I have referred suffices to establish a prima facie case of injury to Double H's business in the form of lost profits in the amount of $150,000. Sonoco points to no record evidence impeaching that to which I have referred. Thus Double H's prima facie case of injury to its business, unrebutted, requires the entry of a judgment in its favor for that amount, trebled.

### III.

Double H also seeks injunctive relief against continuance of the Robinson-Patman Act violation which the trial court found. Section 16 of the Clayton Act, 15 U.S.C. § 26 (1982), provides for such relief "against threatened loss or damage by a violation of the antitrust laws." Although the trial court's opinion is not entirely clear, it appears to hold that as a matter of law a plaintiff which cannot prove a sufficient injury to its business or property to obtain relief under section 4 of the Clayton Act cannot obtain a section 16 injunction.

That analysis, if it was intended, is inconsistent with the plain language of section 15, and with the Supreme Court's most recent interpretation of it.

In keeping with the Robinson-Patman Act's prophylactic purpose, § 2(a) "does not 'require that the discriminations . must in fact have harmed competition.'" *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981), quoting *Corn Products [Refining Co. v. F.T.C.]*, 324 U.S. [726] at 742, 65 S.Ct. [961] at 969, [89 L.Ed. 1320]. This reasonable possibility of harm is often referred to as competitive injury. Unless rebutted by one of the Robinson-Patman Act's affirmative defenses, a showing of competitive injury as part of a prima facie case is sufficient to support injunctive relief, and to authorize further inquiry by the courts into whether the plaintiff is entitled to treble damages under § 4 of the Clayton Act, 38 Stat. 731, as amended, 15 U.S.C. § 15 (1976 ed., Supp. V). *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435, 103 S.Ct. 1282, 1288–89, 75 L.Ed.2d 174 (1983). Thus the court's section 2(a) violation finding, which I do not find clearly erroneous, was itself a sufficient predicate for injunctive relief, without any further inquiry into actual injury to the plaintiff's business or property. Moreover, the trial court's rejection of Double H's unrebutted prima facie case of section 4 injury is clearly erroneous. Thus even under the trial court's analysis a reversal of the denial of injunctive relief is required.

### IV.

The judgment appealed from should be reversed insofar as it dismissed Double H's claims for treble damages under section 4 of the Clayton Act and for injunctive relief under section 16 of the Clayton Act. The case should be remanded: (1) for the entry of an appropriate award of damages, trebled; (2) for the framing of an appropriate injunction against price discriminations by Sonoco to NCR; and (3) for the determina-

tion of counsel fees.[4] Thus I respectfully dissent.

---

4. Because Double H has not pointed to any additional relief which would be available if the trial court had considered the merits of its pendent state law claim for damages for interfer- ence with prospective economic advantage, I have no reason to address that ground for ap- peal. Double H does not appeal from the dis- missal of its Sherman Act claim.