**GEMINI SUPPLY CORPORATION,**
Plaintiff,

v.

Bernard **ZEITLIN,** Edmer Sanitary Supply Company, Inc., Edward Zeitlin, Glenn Rogers and Jerome Goldberg, Defendants.

**EDMER SANITARY SUPPLY COMPANY, INC.,** Third-Party Plaintiff,

v.

William **ZAGER** and George Flanagan, Third-Party Defendants.

No. CV 84–0524.

United States District Court, E.D. New York.

June 26, 1984.

Edward Rubin, Shapiro, Spiegel, Garfunkel, Rubin & Driggin, New York City, for plaintiff.

Norman Roy Grutman, Grutman Miller Greenspoon Hendler & Levin, New York City, for defendants.

## MEMORANDUM AND ORDER

PLATT, District Judge.

This case is before the Court on the parties' cross-motions for preliminary injunctive relief. Plaintiff Gemini Supply Corporation ("Gemini") seeks to enjoin defendants Edmer Sanitary Supply Company, Inc. ("Edmer"), and Messrs. Bernard Zeitlin, Edward Zeitlin, Glenn Rogers and Jerome Goldberg [1] from violating the Robinson-Patman Act, 15 U.S.C. § 13 *et seq.* (1982). Third-party plaintiff Edmer seeks to enjoin third-party defendants Messrs. William Zager and George Flanagan,[2] as well as Gemini, from soliciting Edmer's customers or using or disclosing certain information which the third-party defendants acquired while employees of Edmer, and which Edmer alleges is confidential. On February 14, 1984, defendants' counsel consented to the entry of a temporary restraining order ("TRO") forbidding defendants from violating the Robinson-Patman Act, and a hearing was held to consider both motions on twelve dates between February 21, 1984 and April 4, 1984. For the reasons that follow, both motions for injunctive relief are denied, and the TRO is dissolved.

### I

Edmer was founded in 1959 by Mr. Bernard Zeitlin. (Tr. p. 731–32). It distributes janitorial and sanitary supplies to businesses and institutions in the New York Metropolitan area. While little or no evidence was presented at the hearing concerning either the size of Edmer, the definition or size of a relevant market, or Edmer's share of that market, it is apparent from the record that the sanitary supply industry is highly competitive, has relatively low barriers to entry and that Edmer is only one of many companies competing in that market. (Tr. p. 753–58).

Messrs. Zager and Flanagan began working for Edmer as salesmen in 1976. (De-

---

1. A sixth defendant, Mr. Jay Schwartz, was released as a party by the plaintiff on the first day of the hearing held to consider the cross-motions.

2. Messrs. Zager and Flanagan are the founders and sole shareholders of Gemini.

fendant's exhibit P, Tr. pp. 210, 1447). Each signed, as a condition of their employment, an agreement in the nature of a restrictive covenant, which provided, *inter alia*, that they would not, for a period of three years after they left Edmer's employ, solicit orders for goods in any city or town they had visited as a salesman for Edmer or from any person who had been a customer of Edmer. They also agreed not to disclose any confidential information they received while with Edmer. (Defendant's exhibits A and Y). During the period between 1976 and October, 1983, Messrs. Zager and Flanagan became two of Edmer's leading salesmen (Tr. p. 878), and each serviced approximately 200 accounts. (Tr. pp. 236, 1456).

During the late part of the summer of 1982 Messrs. Zager and Flanagan, who were growing increasingly dissatisfied with their prospects at Edmer, began considering leaving Edmer and forming their own sanitary supply company. (Tr. p. 212). Over the next fourteen months each of the third-party defendants took certain steps, allegedly on their own time, towards achieving this goal, such as forming Gemini, finding and leasing office space, and assembling a list of potential customers through the purchase of mailing lists from various commercial sources in New York City. (Tr. pp. 213–16). However, Messrs. Zager and Flanagan did not solicit any business on Gemini's behalf from anyone until after October 17, 1983. (Tr. pp. 214–15).

During the week of October 17, 1983, Messrs. Zager and Flanagan resigned from Edmer and began soliciting business for Gemini. Some of the businesses and institutions they solicited were accounts they had serviced while at Edmer, and some were not. There was no credible evidence presented at the hearing that either Mr. Zager or Mr. Flanagan removed written customer information from Edmer at the time of their departure. There *was* considerable evidence that the information Gemini used to solicit prospective customers was either readily available through public sources, e.g., the yellow pages or

else was information which Messrs. Zager and Flanagan remembered from their work at Edmer. (Tr. pp. 218–19).

On or about October 21, 1983, Edmer sought a preliminary injunction in New York State Supreme Court, Nassau County, restraining Messrs. Flanagan and Zager and Gemini from soliciting Edmer's customers or disclosing any information about Edmer's business, such as the names of Edmer's customers. (Tr. p. 903). In support of their motion, Edmer submitted a list of the Edmer accounts serviced by Messrs. Zager and Flanagan to the Court. Mr. Justice Stanley Harwood appended this list to his Memorandum of November 30, 1983 denying the motion for preliminary injunctive relief. Edmer never requested that such list be sealed and it is, and has been for some time, a public record.

In late December, 1983, Messrs. Zager and Flanagan became aware that certain businesses that had been serviced by them while they were with Edmer and which were now purchasing sanitary supplies from Gemini, were being offered what Messrs. Zager and Flanagan felt were drastic price discounts by Edmer. Based on their experience with Edmer, which to their knowledge had rarely offered discounts before, Messrs. Zager and Flanagan felt that these price concessions could have only one purpose—i.e., to drive Gemini out of business. This suit followed.

In their answer to Gemini's complaint, defendants added a counterclaim and third-party action seeking the relief Edmer had failed to get from the Supreme Court, Nassau County. Evidence on both claims for relief was presented at the hearing.

## II

### A

■ In order to prevail on a motion for a preliminary injunction, the moving party must first show the possibility of irreparable injury and then show "either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to

make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Caulfield v. Board of Ed.*, 583 F.2d 605, 610 (2d Cir.1978). We will examine each motion in turn.

### B

Plaintiff's motion papers allege that it will suffer irreparable injury if Edmer is allowed to continue its practice of offering selective deep discounts to their mutual customers. While the evidence adduced at the hearing showed that approximately eighty percent (80%) of Gemini's present customers have previously done business with Edmer (Tr. p. 276) only a fraction of these customers were offered discounts (Tr. p. 229) and only some of those offered discounts stopped purchasing from Gemini. Moreover, the hearing testimony revealed that there are tens of thousands of potential customers for Gemini in the New York Metropolitan area. Given the extent of Gemini's market which has not been subjected to allegedly illegal price discrimination by Edmer, we cannot agree that Gemini will suffer irreparable injury if an injunction is not issued. While Gemini can probably ill afford to lose any customers at this early stage in its corporate life, its financial frailty is common to any start-up business and is not the result of Edmer's alleged illegal conduct.

Gemini has also failed to demonstrate that it would probably succeed on the merits, or that there are serious questions going to the merits *and* a balance of hardships tipping towards Gemini.

■ To prevail on its Robinson-Patman Act claim, Gemini must demonstrate that Edmer has discriminated in the prices it has charged in contemporaneous sales of commodities of like grade and quality between two or more different customers; that at least one of these sales crossed a state line; and that the price discrimination has had or may in the future have the requisite negative effect on competition. Hansen, *Robinson-Patman Law: A Review and Analysis*, 51 Fordham L.Rev.

1113, 1125–34 (1983). The injury to competition can occur either at the "primary line", i.e., between competing sellers, one of whom is discriminating in price, or at the "secondary line", i.e., between two firms at the buyer level, one of whom receives discriminatory prices from a seller. This case is to be judged by the injury to competition at the primary line.

The first two elements of Gemini's proof are not in serious dispute. Edmer has clearly made recent sales of like commodities at different prices. (*Compare* plaintiff's exhibit 15A *with* plaintiff's exhibit 6). It is equally clear and, in fact, defense counsel stipulated that at least one of the sales producing a price discrimination crossed a state line. (Tr. p. 559). Our inquiry, then, is into Gemini's ability to show a primary-line competitive injury.

■ The competitive injury requirement of the Robinson-Patman Act may be met by a showing of either injury to competition at the seller's level or the existence of the seller's predatory intent from which injury to competition may be inferred. ABA Antitrust Section, *Antitrust Law Developments* 231 (2d Ed.1984). There may not be any serious argument that competition in the sanitary supply industry is threatened by the actions of Edmer. The testimony of a competitor, Bruce Janbey, clearly indicated that there are scores of firms selling to tens of thousands of potential customers. (Tr. pp. 756–57). Edmer's actions do not indicate an attempt to gain monopoly power in a market, nor is there any evidence that such an attempt could reasonably be expected to succeed. *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 347 (3d Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982).

■ Gemini must therefore demonstrate that Edmer's actions were predatory to prevail on its motion for a preliminary injunction. The Supreme Court in *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), appeared to take a broad view of what conduct may be admissible to prove preda-

tory intent, which in turn may imply an injury to competition. *Id.* at 702, 87 S.Ct. at 1335. However, since 1975, the year of publication of Areeda and Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Har.L. Rev. 697 (1975), courts have increasingly performed an economic analysis of price discrimination's effect on competition, focusing primarily on whether the discriminatory prices were set above or below the seller's cost to determine whether predatory intent has been proved. As Professors Areeda and Turner note, prices which are at or above a seller's cost are pro-competitive since they may be met by any equally efficient competitor and provide consumers with the lowest price consistent with efficient allocation of resources. *Id.* at 711. Prices below cost, on the other hand, may only be explained as "the deliberate sacrifice of present revenues for the purpose of driving rivals out of the market and then recouping the losses through higher profits earned in the absence of competition." 2 P. Areeda & D. Turner, *Antitrust Law* ¶ 711b at 151 (1978). See *Northeastern Tel. Co. v. American Tel. & Tel. Co.,* 651 F.2d 76, 86 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). Professors Areeda and Turner argue that since the Robinson-Patman Act forbids price discriminations only "where the effect may be substantially to lessen competition", only discriminatory prices which are below cost should violate the Robinson-Patman Act, since only these prices are predatory and anti-competitive. Discriminatory prices above cost should, on the other hand, be *per se* lawful. Areeda & Turner, *Predatory Pricing, supra,* at 733; see 3 P. Areeda & D. Turner, *Antitrust Law, supra,* ¶ 720c at 190.

While courts have not yet adopted this *"per se* lawful" rule for above-cost discriminatory prices, they have increasingly focused on evidence of below-cost pricing when evaluating primary-line competitive injury in Robinson-Patman Act cases. Hansen, *Robinson-Patman Law: A Review and Analysis,* 51 Fordham L.Rev. 1114, 1139–40 (1983). I ABA Antitrust Sec., *The Robinson-Patman Act: Policy and Law* (ABA Monograph No. 4) 81–90 (1980). See *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014 (9th Cir.1981), cert. denied, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982); *O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340 (3d Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982); *Janich Bros. v. American Distilling Co.,* 570 F.2d 848 (9th Cir. 1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Pacific Eng'r Prod. Co. v. Kerr-McGee Corp.,* 551 F.2d 790 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *International Air Indus., Inc. v. American Excelsior Co.,* 517 F.2d 714 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). Thus while we must look for direct evidence of predatory intent, *Double H Plastics, Inc. v. Sonoco Products Co.,* 732 F.2d 351 (3d Cir.1984), evidence of predatory pricing, from which predatory intent may be inferred, is a crucial part of plaintiff's proof.

In this case, the direct evidence of predatory intent consists of the admitted enmity between the principals of Edmer and the principals of Gemini (Tr. pp. 220, 709, 901, 933–35). There was also some evidence that Mr. Bernard Zeitlin had made disparaging remarks to Gemini's suppliers (Tr. 1013). There was not, however, evidence of the type of predatory intent proscribed by the antitrust laws, that is, the intention to sacrifice "present revenues with the hope of obtaining monopoly profits". *Double H Plastics, Inc. v. Sonoco Products Co.,* 732 F.2d at 354, (3d Cir.1984); *O. Hommel Co. v. Ferro Corp.,* 659 F.2d at 348; Areeda & Turner, *Predatory Pricing,* 88 Harv.L.Rev. at 698. While Edmer was obviously displeased by Gemini's attempt to solicit Edmer's client base, often with lower prices than Edmer had charged, there was ample evidence that Edmer accepted competition from the dozens of other sanitary supply firms in the region as a way of life. (Tr. p. 1062). There was no evidence that Edmer had a monopoly posi-

tion in the relevant market, that it was trying to establish one, or that by forcing Gemini out of the market it could recoup the profits lost on the discounted sales by a later price increase. Rather this appeared to be a situation where Edmer realized "the realities of its own market place", i.e., that a new competitor, with special access to its customers, was now in its market which, "standing alone, cannot support an inference of predatory intent." *Double H Plastics, supra,* 732 F.2d at 355.

Nor did Gemini successfully demonstrate Edmer's below-cost pricing. However, before turning to the issue of proving predatory intent through predatory pricing, we must define what we mean by a seller's "cost". Professors Areeda and Turner argue that it is a seller's marginal cost, that is, the cost of each additional increment of production, that should be the basis for analyzing predatory prices: prices above marginal cost are presumptively non-predatory, prices below are presumptively predatory. *Predatory Pricing, supra,* at 732–33. Recognizing that marginal costs are difficult to compute from traditional accounting date, Professors Areeda and Turner propose an alternative measure of a firm's costs, which is the average variable cost, that is, the sum of charges such as the acquisition costs, selling expenses and other costs that fluctuate with the quantity of goods sold. *Id.,* at 716–17. This alternate measure of a firm's cost was adopted by the Second Circuit as a standard to judge allegedly predatory prices in *Northeastern Tel. Co. v. American Tel. & Tel. Co., supra.* While *Northeastern Tel. Co.* involved a claim of predatory pricing under § 2 of the Sherman Act, 15 U.S.C. § 2 (1982), and not the Robinson-Patman Act, courts and commentators agree that the analysis is the same in both situations. See Areeda and Turner, *Predatory Pricing,* 88 Harv.L.Rev. at 727; *Pacific Eng'r Prod. Co. v. Kerr-McGee Corp.,* 551 F.2d at 798.

Using average variable cost as our guide, then, we conclude that Gemini has not shown that Edmer's discounted prices were below this level, and thus has failed to show a likelihood of success on the merits on their Robinson-Patman Act claim.

With one exception, no evidence whatsoever was even submitted with regards to Edmer's acquisition costs on any of the items whose discounts are in dispute. One item, cases of Windex, was shown to have been purchased at $11.06 a case (Ex. R), and sold at prices ranging from $18.75 to $31.20 a case (Exs. 1c, E).[3] Moreover, if we assume that the items for which no acquisition cost evidence was introduced were originally marked up 100% over acquisition cost (Tr. p. 852) then items such as Kleen-glo concentrate cost $2.30 per gallon, and were sold at prices ranging from $3.22 to $4.60 per gallon. (Exs. 4, E); Super Wax Stripper cost $2.55 per gallon and sold at prices ranging from $3.57 to $5.10 per gallon (Exs. 6, E); Premium floor finish cost $3.90 per gallon and sold at prices ranging from $5.46 to $7.80 a gallon (Exs. 4, E). Cotton mop heads cost $24.25 per dozen, and sold at prices ranging from $33.95 to $48.50 per dozen (Exs. 3, E).

Even when we add a selling commission of between 10 and 15% to each item (Tr. p. 369), the court-estimated acquisition costs plus selling costs do not in any case exceed the prices at which these goods were offered to various members of the buying public.[4] Absent a showing that Edmer was selling sanitary supplies below its average variable costs, Gemini may not prevail on

---

**3.** It is questionable whether any of the parties gave proper consideration to what comprises Edmer's "average variable cost" on any of its products in question here. When asked what Edmer's "cost" was on a case of Windex and whether Edmer made a "profit" on a sale at $16 per case and whether such sale was below "your cost," Mr. Bernard Zeitlin replied $11.05 a case and "yes" and "no" to the respective questions (Tr. pp. 1207–08). Left unspecified was a state- ment of what other "costs" may have been involved besides "acquisition cost."

**4.** While we have used the 100% mark-up to approximate Edmer's acquisition cost for each item, there would be nothing to prevent either Edmer or Gemini from showing a different acquisition cost, "average variable cost," etc., at a trial, if any, in this case.

its motion for a preliminary injunction on a theory of predatory pricing. *Northeastern Tel. Co. v. American Tel. & Tel. Co.,* 651 F.2d at 91. See also, *California Computer Products, Inc. v. IBM Corp.,* 613 F.2d 727, 743 (9th Cir.1979).

Since we find that the evidence of personal enmity between the principals of Edmer and Gemini is not sufficient to demonstrate predatory intent for Robinson-Patman Act purposes, and that Gemini has failed to show any instance of Edmer's pricing below its average variable costs, we hold that Gemini has not shown a probability of success on the merits, nor sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping in its favor, *Caulfield v. Board of Ed., supra,* and thus its motion for a preliminary injunction is denied.

### C

■ Edmer alleges that it will be irreparably harmed if Messrs. Zager and Flanagan, along with Gemini are not enjoined from soliciting Edmer's customers or using or disclosing certain information which Edmer considers proprietary and confidential.

As a preliminary matter, we note that Edmer asserts that we have jurisdiction over its claims under 28 U.S.C. § 1337 (1982) and the doctrine of pendent jurisdiction. While we are not totally convinced that Edmer's counterclaim arises out of a "common nucleus of operative fact" with Gemini's claim, *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), our decision below obviates any detailed discussion of this point.

Despite Edmer's arguments about irreparable injury, we find that it would be fully compensable in money damages if Gemini's solicitation of approximately 80 of Edmer's over 2000 customers is ultimately proved wrongful, and furthermore, that Edmer has not demonstrated that its customer list, which it appended to a Nassau County Supreme Court pleading thereby making the same a public record, is either confidential or proprietary. Thus Edmer has not satis-

fied the first requirement for the issuance of a preliminary injunction.

However, a more fundamental shortcoming exists in Edmer's counterclaim. As noted above, one of the first actions Edmer took when it discovered that Messrs. Zager and Flanagan had formed Gemini was to seek a preliminary injunction, seeking the same relief on the same grounds asserted here, in the New York State Supreme Court, Nassau County. That motion was denied on November 30, 1983, and that decision thereby became the law of the case in this proceeding. See J. Moore, J. Lucas & T. Currier, *1 b Moore's Federal Practice,* 155 (2d Ed.1983). Although the doctrine of law of the case is not as rigid as the related doctrines of res judicata or collateral estoppel, see J. Moore, J. Lucas & T. Currier, *1 b Moore's Federal Practice,* 118 (2d Ed.1983), we are hesitant to upset the determination of a State court on a question of State law, absent a showing of "substantially different evidence at a subsequent trial, new controlling authority, or the prior decision was clearly erroneous and would result in injustice." *Handi Investment Co. v. Mobil Oil Co.,* 653 F.2d 391 (9th Cir.1981).

Edmer failed to make any such showing at the hearing before this Court. On the contrary, the proof showed that (a) to the extent that Messrs. Zager and Flanagan removed information from Edmer it was via information they retained in their heads after seven (7) years of work; (b) the types of customers in question are matters of common knowledge in the highly competitive sanitary supply industry, and a customer list could be recreated out of public documents such as the yellow pages; (c) Edmer submitted a "confidential" customer list as part of a pleading filed in the Nassau County Supreme Court proceeding, and never sought to have that list sealed or otherwise protected from public inspection; and (d) when asked the hypothetical question about what he would do in similar circumstances, one of Edmer's competitors revealingly replied "nothing—that's business" (Tr. p. 820). Edmer has also failed to

indicate any new controlling authority which might justify our disturbing the Nassau County Supreme Court's decision.

Edmer argued at the hearing that they were represented by other counsel in the State Court proceeding and that they failed to submit certain evidence to the State Supreme Court which they submitted to the undersigned. However, "it is not enough ... that defendants could now make a more persuasive argument.... The law of the case will be disregarded only when the court has 'a clear conviction of error'". *Fogel v. Chestnutt*, 668 F.2d 100 (2d Cir. 1981), *cert. denied*, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982), quoting *Zdanok v. Glidden*, 327 F.2d 944, 953 (2d Cir.1964), citing, in turn, *Johnson v. Cadillac Motor Car Co.*, 261 F. 878, 886 (2d Cir.1919). We do not have such a conviction, and consequently Edmer's motion for a preliminary injunction must be, and the same hereby is, denied.

### D

For all of the above reasons the parties' cross-motions for preliminary injunctive relief must be, and hereby are, denied.

SO ORDERED.