**LONG ISLAND–AIRPORTS LIMOUSINE SERVICE CORP., Plaintiff,**

v.

**NEW YORK AIRPORT SERVICES CORP. d/b/a Long Island Connecticut Limousine Group, Defendant.**

No. 86 CV 624.

United States District Court, E.D. New York.

May 27, 1986.

Lilling & Greenspan, White Plains, N.Y. by Myron Greenspan, for plaintiff.

Shea & Gould, New York City by Sheldon D. Camhy, for defendant.

MEMORANDUM AND ORDER

PLATT, District Judge.

## INTRODUCTION

Although many of its hamlets and communities still bear names[1] given to them by one or more of the thirteen Indian tribes who inhabited Long Island when the Dutch and thereafter the English (from England and New England) first settled here in the early 1600's, Long Island's name appears to have been bestowed on her by these settlers and not by the native inhabitants.[2]

For some two hundred years most of the transportation in and about the island was by coastal craft serving the various communities fortunate enough to have harbor or bay facilities although, of course, there were stage coaches and other horse drawn conveyances. In 1884 the *Long Island* Railroad (LIRR) completed its line all the way to Greenport and a new era of transportation was launched which has lasted until this day; the LIRR reputedly presently being the largest commuter carrier in the world.[3]

Over the centuries numerous businesses using the name "Long Island" in their titles have risen and fallen and today the Suffolk and Nassau telephone directories carry almost four pages, and the Brooklyn and Queens directories an additional page and a quarter, of names of businesses and institutions using this almost four hundred year old name or its abbreviation, "L.I.". With the advent of aviation it was not surprising that at least one of the three major airports used the geographically descriptive name Long Island in its title, *viz.*, Long Island MacArthur Airport (also known more recently as Islip), and two airlines, *viz.*, Long Island Airlines Ltd. and Flightways of Long Island, both flying out of Republic Airport, also use the name.

Against this background of very common usage of this geographically descriptive appellation, plaintiff has brought this lawsuit and an application for a preliminary injunction seeking to restrain a Connecticut competitor from adding to its name the words "Long Island" to alert prospective customers that it now provides airport service not only to Connecticut but to the Long Island area as well. Plaintiff argues that having been the first to provide line-haul transportation service utilizing such name it is entitled to the exclusive use thereof. For the obvious, and perhaps less obvious, reasons delineated below we decline to issue any such injunction.

Also of interest to native Long Islanders is plaintiff's continuous attempt to equate Long Island with the "trade" and "residents" of Nassau and Suffolk Counties. To the some four million residents and workers in Queens and Kings Counties (to say nothing of most of the Judges in this Court), it will come as something of a shock and a surprise that they are no longer a part of that historical land mass known for the past 400 years by the name Long Island.

### A. *Nature of the Case and Procedural Posture*

Jurisdictional authority to hear and decide plaintiff's application for a preliminary injunction in this case of alleged trademark infringement and unfair competition is vested in this Court pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331 and § 1338. Venue is proper under 28 U.S.C. § 1391(b) and (c).

The complaint was filed on March 12, 1986 and the Court heard argument on plaintiff's application for preliminary equitable relief on March 28, 1986. At that time the Court learned that on January 23, 1986 the plaintiff had filed for protection from creditors under Chapter 11 of the

---

**1.** *E.g.,* Hauppaugue, Massapequa, Matinecock, Mattituck, Quogue, Ammagansett, Asharoken, Patchogue, Ronkonkoma, Montauk, Peconic, Nesconset, Nissequogue, Ponquogue, Sagaponack, Setauket, Shinnecock Hills, Speonk, Wyandanch, Yaphank, Copiague, Syosset, Wantagh, etc.

**2.** At one time in its history Long Island was known as Ye Island of Nassau, "in honor of the

Princes of the House of Nassau, whose lion on the family coat of arms Nassau County adopted, and still uses on the County seal." *A History of the United States Court for the Eastern District of New York,* p. 40 n. 1 (1965).

**3.** As discussed below, the defendant interestingly enough claims to be the largest scheduled airport commuter carrier in the world.

federal bankruptcy laws. In response to the Court's query plaintiff admitted its failure to request and receive authority from the Bankruptcy Court for the Eastern District of New York to pursue the instant action. After a colloquy with the undersigned, plaintiff indicated a desire to proceed with the motion and await a decision from this Court until after obtaining approval from Judge Goetz of the Bankruptcy Court.

Permission was duly granted and post-argument memoranda were fully submitted on May 6, 1986. Since that date, however, the Court has received a welter of letters as both sides continue to augment their arguments and contest their adversary's exposition of law and fact. Although the competing affidavits and the flurry of communication often obscure more than they illuminate, the central problem of the case is well focused.

### B. *The Facts of the Case*

#### 1. *The Parties*

The plaintiff, Long Island-Airports Limousine Service Corp. (LIALS), has for twenty-five years enjoyed a veritable monopoly of the shuttle service between the New York metropolitan airports and Nassau and Suffolk Counties. Recently, however, LIALS' successful and profitable business has suffered several setbacks.

First and foremost, LIALS and its president have been convicted of insurance fraud and criminal contempt. *See People v. Stuart*, Indict. No. 971–83 slip op. (Suffolk County Civ.Ct. Aug. 14, 1984). Consequently, on May 14, 1985 the New York State Department of Transportation (DOT) revoked LIALS' authority to operate because the company was "no longer fit to hold operating authority ... because of serious violations of the Penal Law and Transportation Law." *See* Horn Aff., Ex.S. Similarly the Port Authority of New York and New Jersey ousted LIALS from access to its airport referral system and counterspace for taking reservations. Horn Aff. at ¶ 21.

Finally, on January 23, 1986 LIALS filed for bankruptcy. Whether plaintiff is actually bereft of assets or whether this was "simply a strategic end run around the Port Authority ... to keep from losing its right to have counters and telephones in certain airport terminals," as *Newsday* reports Perry Stuart, vice-president of LIALS, stated, is beyond the scope of our consideration. Horn Aff., Ex.W.

The defendant is an affiliate of the Connecticut Limousine Group, Inc., which since 1960 has operated a line-haul automotive transport service between Connecticut and the major New York airports. With a fleet of approximately 200 vehicles they claim to be the "biggest scheduled limousine service in the world." Horn Aff. at ¶ 27. Since at least 1977 defendant's stretch suburban limousines have been painted light blue with the name "Connecticut Limousine" appearing in white letters underscored by an orange stripe. Prior to that time they were a very dark, and much less visible, green.

Based partially on their success in Connecticut and partially due to LIALS' uncertain status, the defendant sought authority from the DOT to service three routes in Long Island. Approval was given in August 1985 authorizing service to begin in November.

When petitioning the DOT the defendant listed its new Long Island division as New York Airport Services Corporation. In the course of developing their marketing strategy, however, defendant decided that it would be preferable to retain the name Connecticut Limousine to capitalize on the recognition and good will associated with it and add "Long Island" to indicate that service was now available to a new geographic area. Pending a formal change in the corporate name defendant filed a Certificate of Assumed Name with the New York Department of State, which change became effective on November 12, 1985. Horn Aff. at ¶¶ 30–31.

#### 2. *The Controversy*

LIALS asserts that defendant's use of "Long Island" in its trade name violates

the trademark laws because LIALS' twenty-five years of use has imparted secondary meaning to the words in connection with the airport-to-suburb limousine service market in Long Island. Similarly plaintiff claims that defendant's use of an orange stripe in its trade dress is an infringement of the LIALS logo and trademark.

## DISCUSSION

The law in the Second Circuit governing the granting of a preliminary injunction is now well settled. In *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1359 (2d Cir.1976), the Court of Appeals acknowledged that irreparable harm is "a fundamental and traditional requirement of all preliminary relief," citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648 (1975). Reasoning that if a showing of irreparable harm is required where a plaintiff must also establish probable success on the merits, "then *a fortiori* where the plaintiff establishes something less than probable success as to the merits, need for proof of the threat of irreparable damage is even more pronounced. In sum the balancing of hardships test ... necessarily includes the showing of irreparable harm." 535 F.2d at 1359.

Thus, to obtain a preliminary injunction in this Circuit a movant must establish: (1) irreparable harm and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping in movant's favor. *See Power Test Petroleum Distributors v. Calcu Gas*, 754 F.2d 91, 95 (2d Cir.1985); *Gemini Supply Corp. v. Zeitlin*, 590 F.Supp. 153, 155–56 (E.D.N.Y.1984). The standard is equally applicable in a trademark action. *See, e.g., General Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105, 109 (2d Cir.1986); *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 66 (2d Cir.1985).

### A. *Irreparable Harm*

This prong of the test is critical to LIALS' application and, therefore, warrants close and careful scrutiny by the Court. Ordinarily in a trademark action, a showing that an appreciable number of prudent purchasers are likely to be confused as to the source of a product will establish a risk of irreparable injury to the reputation of the trademark sought to be protected. *General Motors Corp.*, 786 F.2d at 109.

Based on the affidavits submitted, this Court may not say that a likelihood of such confusion has been established. One affiant, employed as a LIALS reservationist in Hauppauge, avers that during the month of January she received between 30 and 40 phone inquiries as to "whether or not we were Long Island Airports Limousine Service Corp.... and not 'Long Island Connecticut Limousine' before they would make a reservation." Arena Aff., Pl's Mem., Ex. 14. This testimony suggests that Long Islanders are aware of the two competing services, and those to whom the difference matters will assure that they ride with the service of their choice.

Any confusion created by the mere fact that plaintiff and its employees, *see, e.g.,* Phillips, Bjornsson, Allen, Kessaris and Campbell Affs., Pl's Mem., Exs. 13, 15–18, have for years referred to the corporation as "Long Island" (there being no other Long Island limousine service), does not persuade this Court that plaintiff is entitled to interim injunctive relief. If the name Long Island Airports Limousine Service is too long to say over the telephone, the acronym LIALS is an available alternative that is even shorter than "Long Island."

LIALS recites a variety of additional related reasons why irreparable harm will result if a preliminary injunction does not issue forthwith. First, it will "lose significant business." Pl's Mem. at p. 20. LIALS implicitly acknowledges that this may be partially attributable to the entrance of a competitor in the market because it states that "it will not be possible with precision to determine the number of passengers that will be confused and enticed to use defendant's services by means of its misrepresentations," and therefore, it will be impossible to calculate plaintiff's actual

damages. *Id.* Second, defendant's activity "will continue to erode and dilute the strength and secondary meaning which plaintiff has established over approximately one quarter of a century." *Id.* Finally, "to the extent that the quality of defendant's services do not rise to those of plaintiff, plaintiff stands to be substantially harmed in its fine reputation." *Id.*

The Court cannot agree with LIALS that any of these factors constitute irreparable harm. The Court concurs with plaintiff to the extent that the entry of a competitor into its previously monopolized market will reduce its business volume. Yet to speculate on the number of riders who may have developed such loyalty to LIALS that they refuse to ride with anyone else, but are still not attuned enough to the LIALS logo that they will climb mistakenly into one of defendant's stretch suburbans would be fruitless and a waste of judicial resources. In any event, the Court ventures to guess that the number would be small. To reiterate the Court's view expressed at oral argument, "the average passenger [couldn't] care less about either [company] and what you put on the side of your bus. The sole concern … is to find the first one that is going to get [him] home first." Tr. at p. 30.

If, indeed, LIALS prevails at trial and produces evidence of a reduction in customers due to defendant's use of "Long Island" and the color orange, this Court is confident that a permanent injunction preventing further unlawful use, coupled with a monetary award would remedy LIALS' injury and satisfy its creditors. Certainly we need not worry whether a failure to issue a preliminary injunction will precipitate LIALS' bankruptcy because plaintiff has already taken refuge in Chapter 11's safe harbor. The Second Circuit recognizes and recently reemphasized that "where money damages are adequate compensation, a preliminary injunction will not issue since equity should not intervene where there is an adequate remedy at law." *Loveridge v. Pendleton Woolen Mills, Inc.,* 788 F.2d 914, 917–18 (2d Cir. 1986).

Regarding LIALS' assertion that defendant's use of "Long Island" will dilute its trademark, this Court is not at all convinced that "Long Island," as opposed to LIALS, has acquired secondary meaning to make that a viable injury. Although plaintiff cites cases where descriptive terms have acquired secondary meaning, all are distinguishable from the case at bar. In this instance plaintiff's trade name is a geographically descriptive one whose association with plaintiff in connection with the airport limousine service is due at least as much to its monopoly status, courtesy of the DOT, as to its advertising.

Defendant now enters the market and seeks to use a trade name describing the two locations to which its cars travel. To foreclose defendant from so doing would place an arbitrary and unfair restriction on the use of a geographic name. However, defendant's insistence on placing "Long Island" in screaming type and placing the word "Connecticut" below it in miniscule print seems to the Court to have been an unnecessary and imprudent business decision. The Court has recently been informed, though, that pursuant to its suggestion at oral argument, *see* Tr. at pp. 33–35, defendant has revised its logo as it appears in its advertising, boarding passes, schedules and other printed materials by placing "Connecticut Limousine Group" in bigger and bolder typeface. *See* Letter from Sheldon Camhy to Judge Platt (April 18, 1986). "Long Island" still appears in larger print but the reason, according to defendant's attorney, is that if the words appeared in the same print the average passenger wouldn't "know whether you're going to Long Island or Connecticut. When he sees Long Island in nice big letters he knows you're going to Long Island." Tr. at 29.

Although a failure to show irreparable harm warrants denial of a preliminary injunction, this Court is mindful of the Second Circuit's pronouncement that "[s]uits for trademark infringement demand a 'comprehensive analysis of all the relevant

facts and circumstances.' " *Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 209 (2d Cir.1985) (citation omitted). Therefore, the Court will proceed to examine all the other elements of the standard.

### B. *Likelihood of Success on the Merits*

This prong of the preliminary injunction standard requires analysis of the Lanham Trade-Mark Act. Section 43(a), codified at 15 U.S.C. § 1125(a) (1982), prohibits false designation of origin and false description or representation, whether or not the trademark is registered. Section 43(a) is the only section of the Act that applies to unregistered marks.

Before applying the relevant law to the facts at bar, we note that "[in] determining whether an existing unregistered mark should be protected against the introduction of a 'similar' mark by a junior user," the Second Circuit has, "traditionally employed a variety of approaches, including the mark's classification; its likelihood of confusion; and the 'second-comer' doctrine. These standards, however, suffer from a variety of analytical infirmities that limit their ability to resolve disputes satisfactorily." *Thompson Medical Co.*, 753 F.2d at 212. Not surprisingly, therefore, "[r]azor-thin judgment calls are indigenous to the law of trademark protection." *Id.*

LIALS also advances a claim for unfair competition, but separate discussion is not necessary because the law of trademark infringement is subsumed in the law of unfair competition and the same test is applied in determining each claim. *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 664 (2d Cir.1979).

In *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1974), Judge Friendly set forth four classifications of trademarks conferring differing degrees of eligibility for protection. The classes are (1) generic—never eligible for protection, (2) descriptive—protectible only where secondary meaning is established, (3) suggestive—protectible without proof of secondary meaning, and (4) arbitrary or fanciful—

presumptively protectible. *Id.* at 9. The trade name at bar is clearly descriptive; hence it may not be protected without proof of secondary meaning.

Secondary meaning is a term of art connoting that "consumers have come to associate [a name] with a particular manufacturer or source." *Perfect Fit Industries v. Acme Quilting Co., Inc.*, 618 F.2d 950, 953 (2d Cir.1980) (a descriptive or geographic mark receives protection against copying only if it has acquired secondary meaning). Absent secondary meaning there can be no confusion among consumers traveling by limousine from the airports to Long Island between the identities of LIALS and Long Island Connecticut Limousine Group.

Factors the courts have weighed in determining whether to protect a trademark include those articulated by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961): "the strength of [the] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers."

Applying these factors to the case at bar supports the conclusion that a preliminary injunction is not mandated to protect plaintiff's mark:

(1) the strength of the mark—as evidenced by the attached photographs of several of plaintiff's vehicles (*see* Appendix), the LIALS logo is the emphasized mark, not Long Island Airport Limousine Service;.

(2) the degree of similarity between the two marks—there is virtually no similarity between LIALS and Long Island Connecticut Limousine Group;

(3) the proximity of the product—although both parties provide airport transportation for Nassau and Suffolk residents, LIALS services more locations than the

defendant,[4] at a cheaper rate and in different types of vehicles (*see* Appendix);

(4) the likelihood the prior owner will bridge the gap—again there is little present likelihood that LIALS will either seek to upgrade its prices and its fleet or to enter the Connecticut market and add that name to its own;

(5) actual confusion—except for the handful of visitors to the Island who may be unfamiliar with the two companies and who have not been instructed to look for LIALS, there should be no confusion whatsoever between the two services (*see supra* p. 1008);

(6) defendant's good faith has been demonstrated by its voluntary modification of its logo enlarging the words Connecticut Limousine Group on all of its printed material;

(7) the quality of defendant's service is certainly not inferior to that of LIALS, indeed it is a more expensive alternative; and, finally

(8) the sophistication of the buyers—the New York metropolitan airports service an ever-expanding number of business and vacation travelers who are exceptionally savvy in securing access transportation at a cost and quality to suit their needs.

These factors are neither complete nor dispositive. They were formulated in a case involving a registered trademark and the products involved were different rather than identical. Nevertheless, they provide useful guidelines to be considered along with the length and exclusivity of plaintiff's use, the volume of sales, the extent of advertising and any other compelling circumstances in a case.

In the pending matter the Court has assessed all of these factors and reached the opinion that whatever association the name Long Island has developed with the plaintiff, it is less attributable to LIALS' service and $120,000 annual advertising budget than to the fact that LIALS enjoyed a DOT sanctioned monopoly in line-haul transportation service for the past 25 years. At best this creates an artificial association between Long Island and LIALS' limousine service from the airports to Nassau and Suffolk Counties.

Furthermore, even if plaintiff at trial could convince a jury that secondary meaning has attached to the name Long Island Airports Limousine Service, it does not appear to this Court that there is a strong likelihood of confusion between that name or its acronym LIALS and Long Island Connecticut Limousine Group. *See supra* p. 1009. Defendant has demonstrated its good faith and attempted to minimize this risk by revising its printed material to increase the emphasis on the word Connecticut. This action suggests that the secondcomer doctrine is inapplicable because defendant was and is not motivated by a bad faith intent to pirate plaintiff's trade name, but freely wishes to distinguish itself from the plaintiff.

Moreover, it comes with some ill grace for LIALS to argue that it is entitled to the benefits of the "second-comer" doctrine because, of course, it is at best a "second-comer" itself in the business of shuttling Long Islanders from the airports to the Long Island Railroad. Any experienced Long Island airline flier will recall the Railroad's recently discontinued arrangement with the inter-airport Carey Limousine service which regularly stopped at the LIRR Jamaica station to pick up and discharge airline passengers. Still today, many Long Island commuters utilize a taxi cab connection at that station which, together with their monthly commutation tickets, is less expensive and usually more efficient than either plaintiff's or defendant's limousine service.

For all the reasons so stated the Court feels that plaintiff is not likely to prevail on the merits.

In the interim the DOT has reportedly authorized an expansion of Long Island Connecticut Limousine Group's services.

---

**4.** When the complaint was filed and when argument was heard, defendant operated three routes to Long Island, each having three stops.

### C. *Sufficiently Serious Questions Going to the Merits*

Although the Court may not say that LIALS enjoys a likelihood of success on the merits, the Court concedes that this less rigorous prong of the standard may be satisfied because the ultimate outcome in this case will hinge upon a number of factual findings which this Court cannot predict simply by reading affidavits but without hearing witness testimony with its inherent benefit of cross-examination. The Court, therefore, will weigh the balance of hardships to see if it tips in movant's favor.

### D. *The Balance of Hardships*

Although both sides are likely to be inconvenienced by this litigation, the Court must assess which side may be more harmfully affected by a preliminary injunction. As previously stated, *supra* pp. 1009–1010, if preliminary injunctive relief is denied, LIALS may lose some customers who are misled by defendant's name and vehicles. Yet this is a speculative injury which, if it materializes at trial, could be compensable with a monetary award.

Conversely, if this Court does issue a preliminary injunction enjoining defendant from using the name "Long Island" or the color orange on its limousines or printed material, the defendant would have to devise a new name and repaint its entire fleet at some cost and some disruption of service. If the final verdict favored Long Island Connecticut Limousine Group it would then have to repaint its fleet, restore its former name and reeducate the public. The resulting confusion caused by two successive name changes would be understandably real. The Court has already noted with approval that defendant has voluntarily revised its print advertising to highlight the connection with the Connecticut Limousine Group. Defendant has taken some steps to minimize confusion and to distinguish itself. *See, e.g.,* Def's Mem. Ex.K. To ask it to do even more at this stage would be premature and unduly disruptive of its operations.

### CONCLUSION

For all of the reasons set forth above the Court favors maintaining the status quo pending the final outcome of this litigation. This decision will allow the two parties to continue to compete and will benefit all those residents of Long Island who must occasionally find transportation to and from the airports. If it appears at the end of a trial on the merits that this competition is producing confusion in the minds of the consumers, LIALS will be entitled to a permanent injunction and a compensatory monetary award.

SO ORDERED.

## APPENDIX
### Comparison of Plaintiff's and Defendant's Vehicles